**24-13640-C**

# United States Court of Appeals

*for the*

# Eleventh Circuit

---

UPSIDE FOODS, INC.,

*Plaintiff/Appellant,*

– v. –

COMMISSIONER OF THE FLORIDA DEPARTMENT OF AGRICULTURE
AND CONSUMER SERVICES WILTON SIMPSON, *et. al.*,

*Defendants/Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
CASE NO: 4:24-cv-00316-MW-MAF
(Hon. Mark E. Walker)

## INITIAL BRIEF OF APPELLANT

Paul M. Sherman (VA 73410) †
Suranjan Sen (TN 038830)
Samuel B. Gedge (VA 80387)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia  22203
(703) 682-9320 (Telephone)
(703) 682-9321 (Facsimile)
psherman@ij.org
ssen@ij.org
sgedge@ig.org

† *Lead Counsel*
*Counsel for Plaintiff/Appellant*

Ari Bargil (FL 71454)
INSTITUTE FOR JUSTICE
2 South Biscayne Boulevard, Suite 3180
Miami, Florida 33131
(305) 721-1600 (Telephone)
(305) 721-1601 (Facsimile)
abargil@ij.org

*Counsel for Plaintiff/Appellant*

*UPSIDE Foods, Inc. v. Commissioner of the FL Dept. of Agriculture and Consumer Services Wilton Simpson, et al.*, Record No. 24-13640-C

## CERTIFICATE OF INTERESTED PERSONS

**Chief U.S. District Judge, U.S. District Court, Northern District of Florida, Tallahassee Division:**

   1.  The Honorable Mark E. Walker, Chief U.S. District Court

**Appellant:**

   1.  UPSIDE Foods, Inc.

**Appellant's Counsel:**

   2.  Bargil, Ari S.

   3.  Gedge, Samuel B.

   4.  Institute for Justice

   5.  Sen, Suranjan

   6.  Sherman, Paul M.

**Commissioner of the Florida Department of Agriculture and Consumer Services Appellee:**

   7.  Simpson, Wilton

**Appellee Wilton Simpson's Counsel:**

   8.  Banks, Ashlyn R.

   9.  Florida Department of Agriculture and Consumer Services

  10.  Garner, Sean T.

  11.  Harle, Denise M.

*UPSIDE Foods, Inc. v. Commissioner of the FL Dept. of Agriculture and Consumer Services Wilton Simpson, et al.*, Record No. 24-13640-C

12. Nordby, Daniel E.

13. Polston, Ricky L.

14. Reardon, Kassandra S.

15. Shaw, Darby G.

16. Shutts & Bowen LLP

**State Attorney Appellees:**

17. Bain, Andrew A.

18. Bartlett, Bruce L.

19. Campbell, Jack

20. Rundle, Katherine Fernandez

**State Attorney Appellees' Counsel:**

21. Bell, Daniel W.

22. Costello, David M.

23. Florida Attorney General Office

24. Moody, Ashley Florida Attorney General

25. O'Hickey, Bridget K.

26. Stafford, III, William H.

27. Swartz, Foster H.

28. Whitaker, Henry C.

*UPSIDE Foods, Inc. v. Commissioner of the FL Dept. of Agriculture and Consumer Services Wilton Simpson, et al.*, Record No. 24-13640-C

## CORPORATE DISCLOSURE STATEMENT

I hereby certify that Plaintiff/Appellant UPSIDE Foods, Inc., has no parent corporation, and no publicly held corporation <u>owns 10% or more of its stock</u>.

Dated December 16, 2024.

/s/ Paul M. Sherman
Counsel for Plaintiff/Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Appellant UPSIDE Foods, Inc., respectfully requests twenty minutes of oral argument for each side. This case presents a question of first impression regarding the preemptive scope of the Poultry Products Inspection Act, 21 U.S.C. §§ 451–73, and its application to Florida's first-in-the-nation ban on the manufacture, distribution, or sale of poultry products created through the newly developed production processes of cell cultivation.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Parties and Corporate Disclosure Statement ................................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF CITATIONS ............................................................... iv

JURISDICTIONAL STATEMENT ............................................... ix

STATEMENT OF THE ISSUE .................................................... 1

STATEMENT OF THE CASE ...................................................... 2

    I.    UPSIDE Foods and the Science of Cultivated Meat ................... 3

    II.   Federal Regulation of Cultivated Poultry Products ................... 6

        A.   The Poultry Products Inspection Act ..................................... 6

        B.   The USDA treats conventional and cultivated poultry products the same ................................................................ 10

    III.  UPSIDE Receives Federal Authorization to Sell Its Cultivated Chicken and Begins Distributing It Nationwide ......................... 12

    IV.  Florida Bans Federally Authorized Cultivated Meat to Protect In-State Agricultural Interests from Out-of-State Competition ................................................................................ 15

    V.   Ongoing Irreparable Harm to UPSIDE ...................................... 20

    VI.  Proceedings Below ........................................................................ 24

STANDARD OF REVIEW ........................................................... 27

SUMMARY OF ARGUMENT ..................................................... 28

ARGUMENT .................................................................................. 32

    I.    The District Court Erred in Concluding That UPSIDE Had
        Not Shown a Likelihood of Success on the Merits of Its
        Federal Preemption Claims .................................................... 32

        A. The PPIA's express preemption provisions do not
           require direct conflict between state and federal
           requirements ..................................................................... 33

        B. UPSIDE demonstrated a likelihood of success for both
           its preemption claims ....................................................... 41

        C. Cases involving the treatment of animals outside of
           USDA-regulated official establishments do not
           undermine UPSIDE's preemption claims ........................ 46

    II.    UPSIDE Carried Its Burden Under the Remaining
        Preliminary Injunction Factors ............................................ 51

        A. UPSIDE will be irreparably harmed without an
           injunction ......................................................................... 52

        B. Neither the state nor the public will be harmed by an
           injunction ......................................................................... 55

CONCLUSION .............................................................................. 58

CERTIFICATE OF COMPLIANCE ......................................... 60

CERTIFICATE OF SERVICE .................................................... 61

STATUTORY ADDENDUM

# TABLE OF CITATIONS

Page(s)

## Cases

*ABC Charters, Inc. v. Bronson*,
   591 F. Supp. 2d 1272 (S.D. Fla. 2008) ........................................... 56

*\*Armour & Co v. Ball*,
   468 F.2d 76 (6th Cir. 1972) ................................................. 36, 37, 38

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ........................................................................ 32

*Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*,
   65 F.4th 1261 (11th Cir. 2023)................................................... 32, 33

*Association des Éleveurs de Canards et d'Oies du Québec v. Becerra*,
   870 F.3d 1140 (9th Cir. 2017) ...................................... 42, 43, 47, 48

*Baldwin v. Express Oil Change, LLC*,
   87 F.4th 1292 (11th Cir. 2023)................................................... 53, 54

*Bloedorn v. Grube*,
   631 F.3d 1218 (11th Cir. 2011) ...................................................... 27

*City Walk – Urban Mission Inc. v. Wakulla Cnty.*,
   471 F. Supp. 3d 1268 (N.D. Fla. 2020) ......................................... 57

*Democratic Exec. Comm. of Fla. v. Lee*,
   915 F.3d 1312 (11th Cir. 2019) ...................................................... 57

*Farmworker Ass'n of Fla., Inc. v. Moody*,
   No. 23-cv-22655, 2024 WL 2310150 (S.D. Fla. May 22, 2024)
   ................................................................................................... 55, 56

*Ferrellgas Partners, L.P. v. Barrow*,
   143 F. App'x 180 (11th Cir. 2005)................................................... 54

iv

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    152 F. Supp. 3d 90 (S.D.N.Y. 2015) ................................................. 55

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.,*
    691 F.3d 1250 (11th Cir. 2012) ................................................. 52, 56

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) ...................................................... 57, 58

\*Grocery Manufacturers Ass'n v. Sorrell,*
    102 F. Supp. 3d 583 (D. Vt. 2015) ....................................... 38, 39, 40

*Honeyfund.com Inc. v. Governor of Fla.,*
    94 F.4th 1272 (11th Cir. 2024) ................................................. 27, 55

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) ......................................................... 55

*LaCroix v. Town of Fort Myers Beach,*
    38 F.4th 941 (11th Cir. 2022) ........................................................... 51

*Lightning v. Roadway Exp., Inc.,*
    60 F.3d 1551 (11th Cir. 1995) .......................................................... 28

\*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ................................... 38, 43, 44, 45, 46, 49, 50

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ....................................................................... 46

*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n,*
    584 U.S. 453, 478–79 (2018) .......................................................... 34

*Odebrecht Constr., Inc. v. Sec'y, Florida Dep't of Transp.,*
    715 F.3d 1268 (11th Cir. 2013) ......................................... 52, 53, 55

*Siembra Finca Carmen, LLC* v. *Sec'y of Dep't of Agric. of P.R.,*
    437 F. Supp. 3d 119 (D.P.R. 2020) ........................................... 54, 55

*This That & Other Gift & Tobacco, Inc. v. Cobb Cnty.*,
    285 F.3d 1319 (11th Cir. 2002) ....................................... 51

*United Healthcare Ins. Co. v. AdvancePCS*,
    316 F.3d 737 (8th Cir. 2002) ........................................... 54

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ....................................... 56

*United States v. Brown*,
    332 F.3d 1341 (11th Cir. 2003) ....................................... 27

## Constitutional Provisions

U.S. Const. amend. XI ..................................................... 52

Dormant Commerce Clause, Art I, § 8, cl. 3................................... ix, 6, 24

## Statutes, Codes, and Bill

Poultry Products Inspection Act,
21 U.S.C. §§ 451–73..........................................................i, ix,
    ..........................2, 6-8, 13, 24-26, 28-31, 33-36, 38-41, 44-47, 50, 55
21 U.S.C. § 451 ............................................................ 7, 8
21 U.S.C. § 453(f) ........................................................... 7
21 U.S.C. § 453(p) ......................................................... 8, 44
21 U.S.C. § 467e......................................................... 8, 9, 29, 33, 41, 43, 45

Federal Meat Inspection Act,
21 U.S.C. § 601(j) ........................................................7, 30, 37-39, 44, 49

28 U.S.C. § 1292(a)(1)...................................................... ix

28 U.S.C. § 1331........................................................... ix

28 U.S.C. § 1343........................................................... ix

9 C.F.R. § 381.65........................................................... 11

9 C.F.R. § 381.145(a) ................................................................. 11

9 C.F.R. § 381.145(b) ................................................................. 11

9 C.F.R. § 424.1, .21(c) ........................................................ 10, 11

Fla. Stat. § 500.03(1)(k) ............................................................. 43

Fla. Stat. § 500.121(1)(b) ..................................................... 15, 16

Fla. Stat § 500.172 ..................................................................... 16

Fla. Stat. § 500.452 ........................................................ 15, 16, 43

Fla. Stat. § 570.971(1)(b) ..................................................... 15, 16

Fla. Stat. § 775.082(4)(b) ........................................................... 15

Fla Stat. § 775.083(1)(e) ............................................................ 15

S.B. 1084, § 50, 2024 Leg., Reg. Sess. (Fla. 2024) ..................... ix, 1-3, 15
.......... 16, 19, 22, 24, 25, 29, 30, 32-34, 41, 43, 45, 46, 50, 51, 56, 58

## Other Authorities

The Federalist No. 11 (A. Hamilton) ....................................... 57

FDA Letter to Nicole Berzins, Director of Regulatory Affairs, UPSIDE
Foods (Nov. 16, 2022),
    https://www.fda.gov/media/163260/download .......................... 12, 13

Jeremiah Fasano Memorandum to Administrative File,
    CCC 000002 (November 14, 2022),
    https://www.fda.gov/media/163261/download ............................... 12

Fla. S. Comm. on Agric., S.B. 1084, 2024 Leg., Reg. Sess. (2024),
        https://www.flsenate.gov/Session/Bill/2024/1084/Analyses/
        2024s01084.aeg.PDF ........................................................................ 20

U.S. Dep't of Agric.,
        *Human Food Made with Cultured Animal Cells*,
        https://www.fsis.usda.gov/inspection/compliance-guidance/
        labeling/labeling-policies/human-food-made-cultured-animal-
        cells (Aug. 17, 2023) ................................................................ 11, 13

U.S. Dep't of Agric., FSIS Directive 7800.1,
        *FSIS Responsibilities in Establishments Producing Cell-Cultured*
        *Meat & Poultry Food Products* (June 21, 2023),
        https://www.fsis.usda.gov/policy/fsis-directives/7800.1 ..... 10, 11, 41
        ............................................................................................ 42

U.S. Dep't of Agric., FSIS NOTICE 31-23,
        *Updated Cell-Cultured Meat & Poultry Food Products Sampling*
        *Program* (Jun 29, 2023),
        https://www.fsis.usda.gov/sites/default/files/media_file/
        documents/31-23.pdf .................................................................... 11

## JURISDICTIONAL STATEMENT

This civil rights lawsuit alleges that Florida's recently enacted SB 1084 is expressly preempted under the Poultry Products Inspection Act, 21 U.S.C. §§ 451–73, and violates the Dormant Commerce Clause. The district court had jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1343.

This Court has appellate jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1), because the district court's ruling of October 11, 2024, denied Appellant's motion for a preliminary injunction. Doc. 40. Appellant filed its notice of appeal on November 5, 2024. Doc. 46.

## STATEMENT OF THE ISSUE

Did the district court err in denying a motion for preliminary injunction against enforcement of SB 1084, a Florida law that bans the manufacture, distribution, or sale of cultivated poultry, on the grounds that Appellant UPSIDE Foods, Inc., had failed to demonstrate a likelihood of success on the merits of its claim that Florida's law is expressly preempted under the Poultry Products Inspection Act?

## STATEMENT OF THE CASE

This is an appeal from the denial of a preliminary injunction against Florida's recently enacted SB 1084, a law that prohibits the manufacture, distribution, or sale of meat and poultry products grown directly from animal cells.

In Section I, Plaintiff-Appellant UPSIDE Foods, Inc. (UPSIDE) provides background on its formation and its leading role in the development and production of cultivated meat and poultry products—products that allow consumers to enjoy the taste and texture of meat without the large-scale slaughter required to produce conventional meat. In Section II, UPSIDE describes the federal regulatory regime for poultry products—the Poultry Products Inspection Act and the U.S. Department of Agriculture's (USDA's) implementing regulations—and its application to cultivated meat and poultry products. In Section III, UPSIDE describes how it successfully navigated that regulatory regime and received the necessary federal approvals to sell its cultivated poultry product throughout the country. In Section IV, UPSIDE describes Florida's recently enacted SB 1084, which prohibits the manufacture, distribution, or sale in Florida of cultivated meat or

poultry products. In Section V, UPSIDE describes the ongoing irreparable harm it faces as a result of SB 1084. Finally, in Section VI, UPSIDE describes its lawsuit and the proceedings below on its motion for preliminary injunction.

## I.        UPSIDE Foods and the Science of Cultivated Meat

UPSIDE Foods, Inc., is a start-up company based in Berkeley, California, and founded in 2015 by Uma Valeti, a cardiologist and the company's CEO. Doc. 11-3 at 1–3 (¶¶ 3–4, 9).[1] Dr. Valeti first became interested in alternatives to conventional meat in the mid-1990s while he was still in training to become a cardiologist. Doc. 11-3 at 2–3 (¶¶ 5–8). While running the student kitchen at his medical school, he had to take a trip to a local slaughterhouse to buy several hundred pounds of meat. Doc. 11-3 at 2 (¶ 7). The experience left him convinced that there had to be a better way to produce meat. *Id.* Two decades later, Dr. Valeti founded Memphis Meats, which has since been renamed UPSIDE, which was the first company in the United States to sell "cultivated" meat. Doc. 11-3 at 3 (¶¶ 9–10).

---

[1] In accordance with 11th Circuit Rule 28-5, citations to the record are formatted [Doc. #] at [page number(s)]. Where relevant, paragraph numbers are indicated in a parenthetical.

Cultivated (or "cultured") meat consists of animal cells that are grown directly, rather than being grown inside an animal. Doc. 11-3 at 3 (¶ 10). To produce cultivated meat, the manufacturer first acquires and banks animal cells. Doc. 11-3 at 3 (¶ 11). In the case of UPSIDE's cultivated chicken product, the initial cells were extracted from the carcass of an embryonic chicken that had been removed from its shell and humanely slaughtered. Doc. 65-2 at 2.

Once removed from an animal's body, cells are placed inside a vessel called a cultivator, where the cells are supplied with the same sort of nutrients that they would receive in an animal's body. Doc. 11-3 at 3 (¶ 11). This allows the cells to proliferate. *Id.* Once proliferated to a sufficient degree, these cells can be harvested and formulated into a poultry product that replicates the sensory and taste profile of conventional poultry. Doc. 11-3 at 4 (¶ 12).

UPSIDE is a leading innovator and producer of cultivated meat. It produced the world's first cultivated chicken and duck meat, and it has also innovated various cultivated beef products, including the world's first cultivated beef meatball in 2016. Doc. 11-3 at 4 (¶ 15). For consumers with ethical, environmental, or health-related reasons to

4

avoid consuming conventional meat, cultivated meat offers several benefits. Doc. 11-3 at 4–5 (¶¶ 16–20). Most obviously, cultivated meat does not require the large-scale slaughter of animals that is necessary for the production of conventional meat. Doc. 11-3 at 4 (¶ 16).

Because producing cultivated meat does not require the raising of live animals, it also limits many of the environmental costs associated with the production of conventional meat. Doc. 11-3 at 4–5 (¶ 17). These include costs associated with producing and transporting animal feed, as well as raising and transporting livestock to processing facilities. Doc. 11-3 at 4–5 (¶ 17). They also include things like greenhouse-gas emissions created by livestock and the pollution created by animal waste. Doc. 11-3 at 4–5 (¶ 17).

Cultivated meat also offers a variety of potential health benefits over conventional meat. Doc. 11-3 at 5 (¶ 18). For example, because cultivated meat is grown in clean and controlled environments that are subject to constant monitoring and control, and because it is never exposed to animal waste, it poses fewer risks of environmental contamination, whether by pathogens or disease-causing microorganisms. Doc. 11-3 at 5 (¶¶ 18–19).

5

Besides appealing to consumers who have these concerns, cultivated meat also appeals to consumers who simply enjoy trying new food products and are excited to experience cutting-edge products like UPSIDE's for themselves. Doc. 11-3 at 5 (¶ 21). And because cultivated meat is made from animal cells, it allows consumers to enjoy these benefits without having to sacrifice the taste and texture of conventional meat. Doc. 11-3 at 4 (¶ 12).

## II.      Federal Regulation of Cultivated Poultry Products

In section A, UPSIDE will describe the Poultry Products Inspection Act, which regulates the interstate market in poultry products. In section B, UPSIDE will describe how the USDA applies the PPIA to cultivated poultry products like UPSIDE's.

### A. The Poultry Products Inspection Act

Exercising its power under the Commerce Clause of Article I, section 8 of the Constitution, Congress has enacted a variety of laws that regulate the interstate market for food, including specifically meat and poultry products. Particularly relevant here is the Poultry Products Inspection Act (PPIA), 21 U.S.C. §§ 451–73.

6

In passing the PPIA, Congress explicitly sought to establish uniform federal standards for wholesomeness in poultry products. 21 U.S.C. § 451. Thus, Congress defined "poultry products" broadly to include "any poultry carcass, or part thereof; *or any product which is made wholly or in part from any poultry carcass or part thereof." Id.* § 453 (f) (emphasis added). This broad definition contains a single narrow exception for products that meet two requirements. First, the product must "contain poultry ingredients only in a relatively small proportion or historically have not been considered by consumers as products of the poultry food industry." *Id.* Second, even these products will be considered poultry products subject to the requirements of the PPIA unless they have been "exempted by the Secretary from definition as a poultry product under such conditions as the Secretary may prescribe to assure that the poultry ingredients in such products are not adulterated and that such products are not represented as poultry products." *Id.*[2] Only by satisfying both these requirements may a poultry product be outside the PPIA's scope.

_____

[2] A similarly broad definition applies to "meat food products" subject to regulation under the Federal Meat Inspection Act (FMIA), 21 U.S.C. § 601(j).

To assure that uniform standards were applied to products that fell within this broad definition and to "prevent and eliminate burdens" upon interstate commerce of such products, Congress explicitly provided that the PPIA would preempt state requirements that exceed *or differ* from the federal requirements established under the act. 21 U.S.C. §§ 451, 467e. Two of those preemption provisions are at issue here. These preemption provisions apply to "official establishments" and the products produced in them. As relevant here, an "official establishment" includes "any establishment as determined by the Secretary at which inspection of . . . the processing of poultry products[] is maintained under the authority of [the PPIA]." *Id.* § 453(p).

The first of these express preemption provisions forbids state efforts to regulate the "premises, facilities and operations of any official establishment" regulated under the PPIA in a manner that exceeds or differs from the federal requirements:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section

460 of this title, if consistent therewith, with respect to any such establishment.

21 U.S.C. § 467e.

The second express preemption provision forbids state efforts to regulate the marking, labeling, packaging, or ingredient requirements for articles prepared in any official establishment regulated under the PPIA in a manner that likewise exceeds or differs from the federal requirements:

> Marking, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter . . . .

*Id.*

By their terms, neither of these express preemption provisions requires that there be a conflict between state and federal law before a state requirement will be held preempted. All that is required to trigger preemption is that the state requirements be "in addition to, or different than" those imposed under federal law. *Id.*

9

**B. The USDA treats conventional and cultivated poultry products the same.**

The USDA has determined that cultivated meat products and cultivated poultry products fall within the broad federal definitions of "meat food products" and "poultry products." As a result, it has stated that cultivated meat products and cultivated poultry products are "subject to the same statutory requirements, regulations, and [USDA Food Safety and Inspection Service (FSIS)] oversight authority as meat and poultry food products derived from slaughter."[3]

Under its existing statutory authority, the USDA has promulgated ingredient requirements that govern the use of ingredients in all meat and poultry products. These include regulations that specifically govern which ingredients can and cannot be used in the production of poultry products, and the USDA has expressly stated that these ingredient requirements apply to both conventional and cultivated poultry products.[4]

---

[3] *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/policy/fsis-directives/7800.1.

[4] *See, e.g.*, U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat &*

The USDA has also established regulations for the safe production, labeling, and distribution of poultry products, which apply identically to conventional and cultivated chicken products. These include regulations that specifically govern the processing of poultry products at "official establishments" that are subject to a USDA Grant of Inspection.[5] The USDA has stated that its existing inspectional regime for official establishments that produce meat or poultry products is "immediately applicable" to facilities that produce cultivated meat and poultry products.[6]

---

*Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf; 9 C.F.R. § 424.1, .21(c).

[5] *See, e.g.*, 9 C.F.R. § 381.65, .145(a), .145(b).

[6] U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (Aug. 17, 2023); *see also* FSIS NOTICE 31-23, *Updated Cell-Cultured Meat & Poultry Food Products Sampling Program* (Jun 29, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/31-23.pdf (providing instructions to inspection program personnel on sampling and inspections at facilities that produce cultivated meat and poultry).

III.    **UPSIDE Receives Federal Authorization to Sell Its Cultivated Chicken and Begins Distributing It Nationwide.**

In July 2023, UPSIDE became the first manufacturer of cultivated meat or poultry to sell its product in the United States after passing three significant regulatory milestones. These milestones relate to a cultivated chicken product that looks, cooks, and tastes like a conventional boneless, skinless chicken cutlet. Doc. 11-3 at 7–8 (¶¶ 26–33).

First, on November 16, 2022, UPSIDE became the first cultivated meat producer to successfully complete the FDA's pre-market consultation process. At the end of that evaluation, the FDA issued a scientific memorandum as well as a "no questions" letter to UPSIDE, stating that the FDA had no further questions regarding the safety of UPSIDE's pre-harvest production process or the safety of foods composed of or containing cultivated chicken resulting from UPSIDE's production process. *See* Memorandum from Jeremiah Fasano to Administrative File, CCC 000002 (November 14, 2022), https://www.fda.gov/media/163261/download; Letter from FDA to Nicole Berzins, Director of Regulatory Affairs, UPSIDE Foods (Nov. 16, 2022),

https://www.fda.gov/media/163260/download; Doc. 11-3 at 7–8 (¶¶ 28–29).

Second, on June 14, 2023, the USDA-FSIS approved UPSIDE's product label pursuant to the PPIA and USDA-FSIS's implementing regulations. Doc. 11-3 at 8 (¶30).

Third, on June 21, 2023, the USDA-FSIS issued UPSIDE a Grant of Inspection, allowing the company to begin selling its cultivated poultry product in interstate commerce under federal inspection pursuant to the PPIA and USDA-FSIS's implementing regulations. Doc. 11-3 at 8 (¶31). As an official establishment, UPSIDE's facility is subject to routine USDA-FSIS inspection at the same "inspection frequency also required for processing traditional meat and poultry products." USDA-FSIS, *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (last visited Dec. 16, 2024); Doc. 11-3 at 8 (¶ 32).

After achieving these milestones, UPSIDE began distributing its cultivated chicken in California and elsewhere in the interstate market. Doc. 11-3 at 8 (¶ 33). UPSIDE has distributed its cultivated chicken for

sale at a restaurant in California, among other places. Doc. 11-3 at 8 (¶ 33). UPSIDE has also sold its product in Nevada, Texas, and New York. Doc. 11-3 at 8 (¶ 33).

UPSIDE has also sold and distributed its product within Florida. Doc. 11-3 at 8 (¶ 33). It distributed its product at a tasting event in Miami that took place on June 27, 2024 (before the law at issue here went into effect). Doc. 11-3 at 9 (¶ 34). At that event, UPSIDE engaged with Florida chefs and businesses to serve its chicken to consumers who were eager to try UPSIDE's innovative product. Doc. 11-3 at 9 (¶ 35).

Tasting events like these are an important part of UPSIDE's business because they allow UPSIDE to showcase its product for the purpose both of demonstrating cutting-edge innovation and of dispelling false conceptions regarding what cultivated meat represents. Doc. 11-3 at 9 (¶¶ 36–37). UPSIDE had planned to host another tasting event at the recently held Art Basel event in Miami, which took place December 6–8, 2024, and had begun talks with a Miami-based chef to host another tasting event at the South Beach Wine and Food Festival on February 20, 2025. Doc. 11-3 at 9–10 (¶¶ 38–39).

14

Besides these specific events—as well as similar events in the future—UPSIDE wishes to continue developing business relations with chefs and distributors located within Florida. Doc. 11-3 at 10 (¶ 40). But UPSIDE may no longer distribute—or even offer to distribute—its product within Florida without violating a new Florida law and thereby exposing itself (and any potential business partners) to criminal penalties. Doc. 11-3 at 10–11 (¶¶ 44–46).

IV.    **Florida Bans Federally Authorized Cultivated Meat to Protect In-State Agricultural Interests from Out-of-State Competition**

On May 1, 2024, Florida's governor signed SB 1084, making Florida the first state in the country to ban the manufacture, distribution, or sale of cultivated meat. The law went into effect on July 1, 2024. *See* S.B. 1084, § 50, 2024 Leg., Reg. Sess. (Fla. 2024).

Among other things, that ban makes it a second-degree misdemeanor "for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." Fla. Stat. § 500.452. Violating the Ban carries a penalty of up to 60 days' imprisonment and $500 in fines. Fla. Stat. §§ 775.082(4)(b), .083(1)(e). Food establishments that violate the ban also risk revocation or suspension of their permit,

15

as well as administrative fines of up to $5,000 per violation. Fla. Stat. §§ 500.121(1)(b), 570.971(1)(b).

Any product found to violate the ban is subject to an immediate stop-sale order by the Florida Department of Agriculture and Consumer Services. The Department also has authority to order that products that violate the ban be embargoed or detained and may seek a court order that the product be destroyed. Fla. Stat. §§ 500.172, .452.

Although Florida has a robust conventional meat industry, it has no cultivated-meat industry. Doc. 11-3 at 10 (¶¶ 41–43). No cultivated-meat companies are currently based in Florida. Doc. 11-3 at 10 (¶ 42). And statements at both the signing event for SB 1084 and throughout the legislative history of its enactment make clear that the intent of the law was to protect Florida's in-state agricultural interests from out-of-state competition.

Start with the signing event, which took place on May 1, 2024. Doc. 11-2 at 2 (¶ 4). At that event, held in a rural county known for cattle ranching, Governor DeSantis spoke from behind a podium that featured a sign stating, "SAVE OUR BEEF." Doc. 11-2 at 2–3 (¶¶ 5, 8. During his remarks, the governor did not suggest that cultivated meat

16

poses any threat to public health or safety. Instead, his remarks focused on the competitive threat that cultivated meat poses to the state's agriculture industry.

The governor stated that cultivated meat—with its promise of significantly reducing environmental costs of meat production—might spur people to "finger agriculture as the problem" and cause them to "view[] things like raising cattle as destroying our climate." Doc. 11-2 at 2 (¶ 7). The governor stated that the reason for the ban—and the reason the signing took place in a rural county, and why "we have all these cattlemen here"—is Florida has "put down the marker very clearly: We stand with agriculture, we stand with the cattle ranchers, we stand with our farmers." Doc. 11-2 at 3 (¶ 8).

The governor added that if cultivated meat sales were to be allowed in Florida, it would "wipe the people sitting here today out of business." Doc. 11-2 at 3 (¶ 9). In the governor's words, it was "really important we stand by our agriculture industry, . . . [and] our cattle ranchers, and that's what we're doing here today [by signing the ban]." Doc. 11-2 at 3 (¶ 10).

17

After the governor spoke, Defendant Florida Commissioner of Agriculture Wilton Simpson gave remarks that echoed these sentiments. Doc. 11-2 at 3 (¶ 11). As he explained, the ban is part of a larger effort to favor in-state agricultural interests. *Id.* Among other things, the commissioner remarked that it is "Californians [who] are participating in this crap." Doc. 11-2 at 3–4 (¶ 12).

After the commissioner spoke, he was followed by the president and president-elect of the Florida Cattlemen's Association. Doc. 11-2 at 4 (¶ 13). Both men acknowledged that the purpose of the ban is to protect their industry from out-of-state competition. Doc. 11-2 at 4 (¶ 13).

Senator Jay Collins, who sponsored the ban's legislation, also spoke at the signing event. Doc. 11-2 at 4 (¶ 14). The senator explained that the ban is an attempt to shield Florida's conventional meat industry from competition. In his words, "[o]ur agricultural community is disproportionately affected by things like NAFTA . . . . We cannot let agriculture fail in the state of Florida." Doc. 11-2 at 4 (¶ 15).

Following the senator's comments, Governor DeSantis gave closing remarks. Doc. 11-2 at 4 (¶ 16). The governor explained that

18

Florida has not banned plant-based meat substitutes (such as the Impossible burger) because those are not marketed as "real" meat and therefore do not pose meaningful competition to Florida's commercial agriculture. Doc. 11-2 at 4 (¶ 17). By contrast, the governor explained, "what they're doing with [cultivated meat] is they want to say it's the same as raising cattle and doing it naturally, so there will be then no reason that you have this [conventional meat] industry. So it is designed to be a threat to agriculture as we know it. . . . [W]e're snuffing this out at the beginning." Doc. 11-2 at 5 (¶ 18).

These remarks at the signing ceremony are consistent with remarks made throughout the enactment process of SB 1084. For example, at the March 6, 2024 Florida House session, the House sponsor of the ban (Rep. Danny Alvarez) stated: "If you believe that we are doing this because we know that Florida's agriculture can hold us down and provides plenty of safe, quality beef and agricultural products—you are absolutely correct." Doc. 11-2 at 5 (¶ 20). At that same House session, Representative Dean Black—a professional cattle rancher himself—said that if Florida consumers want to try cultivated

19

meat they should "go to California"; they "sure as heck" should not be able to get it "here in Florida." Doc. 11-2 at 5–6 (¶ 21).

The relevant Senate committee report did not identify any health risk associated with cultivated meat. Instead, the report acknowledged that cultivated meat is produced in a "controlled environment and prepared using conventional food processing and packaging methods." Fla. S. Comm. on Agric., S.B. 1084, 2024 Leg., Reg. Sess. (2024), https://www.flsenate.gov/Session/Bill/2024/1084/Analyses/2024s01084.a eg.PDF, at 19. The report also acknowledged that the FDA and USDA have "a joint regulatory framework for human foods made from cultured cells of livestock and poultry to help ensure that any such products brought to market are safe, unadulterated, and truthfully labeled." *Id.*

## V.    Ongoing Irreparable Harm to UPSIDE

As a result of Florida's ban on cultivated meat, UPSIDE has suffered and will continue to suffer an array of irreparable harms. Doc. 11-3 at 12–13 (¶¶ 50–57).

Before Florida's ban went into effect, UPSIDE had begun a partnership with a Miami-based chef to distribute its cultivated-chicken product in Florida. Doc. 11-3 at 10–11 (¶ 44). UPSIDE had identified

other chefs in Miami and Tallahassee who were interested in partnering with UPSIDE to distribute its product. Doc. 11-3 at 11 (¶ 45).

Before the ban, UPSIDE had plans to work with this same Miami-based chef to distribute its product at the recently held Art Basel exhibition in Miami, which runs from December 6–8, 2024. Doc. 11-3 at 10–11 (¶ 44). UPSIDE had also begun making plans to work with this chef to host a tasting event at the South Beach Wine and Food Festival on February 20, 2025. Doc. 11-3 at 10–11 (¶ 44).

Tasting events like these are an important part of UPSIDE's efforts to market its product to consumers. Doc. 11-3 at 9, 12 (¶¶ 36, 49). But under the ban, tasting events like these are a crime in Florida. Doc. 11-3 at 12 (¶¶ 50–51). If UPSIDE were to distribute—or even offer to distribute—its product in Florida, it would expose itself—and the local chefs and food establishments with which it wishes to partner—to civil and criminal penalties, as well as the embargo and destruction of its products. Doc. 11-3 at 11–12 (¶¶ 46–48).

Before the ban, UPSIDE offered its product to chefs in Florida, and those chefs accepted. As a result of the ban, those things are now

impossible. That causes ongoing harm in the form of missed business and promotional opportunities, reputational damage, loss of consumer goodwill, and lost revenue. Doc. 11-3 at 12–13 (¶¶ 50–53). These missed opportunities and promotional events include one-time-only events, such as the opportunity to distribute its product at the 2024 Art Basel exhibition—which UPSIDE has already been forced to miss—and the 2025 South Beach Food and Wine Festival. Doc. 11-3 at 12 (¶¶ 49–50).

UPSIDE is also missing out on opportunities to continue working with local food establishments to distribute its products, because those food establishments would risk losing their operating licenses. Doc. 11-3 at 11 (¶ 46). This costs UPSIDE not only potential revenue, but critical and irreplaceable opportunities to help grow the nascent market for cultivated poultry by showing consumers how delicious it can taste. Doc. 11-3 at 12 (¶¶ 50–51).

The ban is also causing UPSIDE to endure ongoing reputational harm. Statements made at the signing ceremony for SB 1084 falsely imply that there is something unwholesome or otherwise wrong with or gross about cultivated meat. Yet the ban deprives UPSIDE of the most

straightforward means of dispelling these false implications: allowing consumers to try the product for themselves. Doc. 11-3 at 12 (¶ 51).

Finally, UPSIDE is enduring irreparable harm because the ban has directly contributed to the fragmentation of the interstate market in meat and poultry. Doc. 11-3 at 12–13 (¶ 53). Florida's law makes it harder for UPSIDE to partner with national meat distributors, who generally prefer products they can lawfully sell in any state. Doc. 11-3 at 12 (¶ 52). For the same reason, Florida's ban also makes it harder for UPSIDE to partner with restaurant groups. Doc. 11-3 at 11 (¶ 47). In short, the national nature of the poultry market means a ban in one state has disproportionate economic effect on UPSIDE's business.

Unless a court intervenes, UPSIDE will continue suffering these irreparable harms. If the ban were enjoined, however, UPSIDE would immediately resume its partnership with the Miami-based chef with whom it worked previously to offer cultivated chicken at her restaurant, with the goal of making the product available to restaurant patrons on a limited basis by the first quarter of 2025. Doc. 11-3 at 13–14 (¶ 56). UPSIDE would also partner with that chef to host tasting events at the 2025 South Beach Wine and Food Festival, where hundreds of Florida

consumers would have a chance to try UPSIDE's product. Doc. 11-3 at 13 (¶ 55). UPSIDE would continue hosting similar tastings at future events like Art Basel in 2025 and beyond. Doc. 11-3 at 13 (¶ 55). And UPSIDE would immediately resume reaching out to other chefs in other cities in Florida with the same goal of selling its product in the short and longer term. Doc. 11-3 at 14 (¶ 57).

## VI.    Proceedings Below.

Seeking to avoid these irreparable harms, UPSIDE filed a complaint in the Northern District of Florida on August 12, 2024, alleging that SB 1084 is expressly preempted under the Poultry Products Inspection Act and, separately, that it violates the Dormant Commerce Clause because it had the effect and purpose of discriminating against interstate commerce.

On August 23, 2024, UPSIDE filed a motion for preliminary injunction, raising only its federal preemption claims. Following expedited discovery and briefing, the district court held argument on UPSIDE's motion on October 7. On October 11, the district court denied UPSIDE's motion for preliminary injunction. Doc. 40.

The district court concluded that UPSIDE had established

24

standing to challenge SB 1084 as to Defendant-Appellee Commission of Agriculture Wilton Simpson (whose agency is charged with the civil enforcement of SB 1084) and as to Defendant-Appellee State Attorneys for the Second and Eleventh Judicial Circuits, covering Tallahassee and Miami, whose offices are responsible for criminal enforcement of SB 1084. Doc. 40 at 6–12.[7] The district court also held that UPSIDE's cultivated chicken product was a "poultry product" within the meaning of the PPIA. Doc. 40 at 14 ("Plaintiff produces its cultivated chicken meat by taking chicken cells harvested from a slaughtered chicken— i.e., parts of a 'poultry carcass'—and growing those cells to create more chicken cells. The result is a 'product which is made . . . in part from . . . part [of a poultry carcass].'").

Even so, the district court held that UPSIDE had failed to

---

[7] The court separately held that UPSIDE did not have standing to bring claims against the Florida Attorney General, who has no enforcement authority over SB 1084, and that UPSIDE had, for purposes of the preliminary injunction, failed to demonstrate standing to bring claims against the State Attorneys for the Sixth and Ninth Circuits, because it had failed to produce enough evidence of intent to distribute its product in those circuits. Doc. 40 at 5–6. UPSIDE does not challenge those findings in this appeal, but notes that it has filed an amended complaint removing the Attorney General as a defendant and providing additional allegations about its desire to distribute its product in the Sixth and Ninth Judicial Circuits. Doc. 44.

demonstrate a likelihood of success on the merits of its federal preemption claims. Although the PPIA expressly preempts any state requirements relating to the ingredients in poultry products or the premises, facilities, or operations of official establishments that are "*in addition to*, or different than" federal requirements, the district court characterized UPSIDE as "argu[ing] the Florida ban imposes *inconsistent* requirements" on it. Doc. 40 at 15 (emphasis added). Treating the provisions as requiring a conflict between state and federal law, the court first concluded that because there is "no federal authority that *requires* the sale or use of cultivated meat in any derivative poultry product," Doc. 40 at 17, Florida's prohibition on the use of cultivated cells as an ingredient in poultry products could not constitute a prohibited ingredients requirement. Applying similar conflict-based reasoning, the court then concluded that a prohibition on the manufacture of cultivated poultry in official establishments could not run afoul of the premises, facilities, or operations preemption provision of the PPIA, because federal law has not established specific requirements for the manufacture of cultivated poultry apart from those that apply to all poultry products. Doc. 40 at 18–20.

26

Having concluded that UPSIDE could not show a likelihood of success on the merits, the district court thus denied UPSIDE's motion for preliminary injunction without considering the remaining preliminary injunction factors. This appeal timely followed. Doc. 46.

## STANDARD OF REVIEW

To show entitlement to a preliminary injunction, a movant must show: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1277 (11th Cir. 2024) (cleaned up)..

This Court "review[s] the district court's denial of a preliminary injunction generally for an abuse of discretion, but [it] examine[s] the legal conclusions on which the denial is based *de novo*." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). "A district court by definition abuses its discretion when it makes an error of law." *United States v. Brown*, 332 F.3d 1341, 1343 (11th Cir. 2003) (citation omitted). Here, the district court denied UPSIDE's motion based on its

27

interpretation of the express preemption provisions of the Poultry Products Inspection Act. Like all questions of statutory interpretation, the proper interpretation of the PPIA's preemption provisions is a question of law that is reviewed de novo. *See, e.g.*, *Lightning v. Roadway Exp., Inc.*, 60 F.3d 1551, 1556 (11th Cir. 1995) ("Whether section 301 of the LMRA preempts a state-law claim constitutes a question of law subject to *de novo* review.").

## SUMMARY OF ARGUMENT

The district court's fundamental mistake is that it incorrectly viewed this case as being about conflict preemption. But the preemption regime established by Congress in the PPIA is not based on conflict preemption. Rather, it is a regime of *express* statutory preemption. In cases of express preemption, a law's preemptive scope is determined by statutory text, and direct conflict between state and federal requirements need only be shown if Congress, through its enacted text, has identified conflict as necessary to state a preemption claim. But Congress is also free to enact express preemption provisions that do not require conflict between state and federal requirements, and thus prohibit states from imposing even nonconflicting requirements.

28

Thus, as with all express preemption provisions, the scope of the PPIA's express preemption provisions turns on their specific text. And the plain text of the PPIA's express preemption provisions does not turn on any conflict between state and federal law. Rather, those provisions preempt *any* state requirements relating to the ingredients in poultry products or the premises, operations, or facilities in which they are manufactured "*in addition to*, or different than" those imposed under federal law. 21 U.S.C. § 467e. That broad language manifests Congress's intent to subject the productions of poultry products in official establishments to a single regulatory standard—the federal standard—and to foreclose states from adding requirements for those poultry products even if those requirements do not conflict with federal requirements.

Properly understood, then, the relevant questions here are: (1) Has Florida enacted requirements for the ingredients in poultry products or the premises, facilities, or operations of the official establishments in which they are made, and (2) do those requirements add to or differ from federal requirements in any way? If the answers to both those questions are yes, then SB 1084 is preempted.

29

And that is surely the case here. The USDA has authorized the use of cultivated chicken cells as permissible ingredients in poultry products, yet Florida forbids their use as ingredients. The USDA has held that official establishments may manufacture poultry products containing cultivated poultry cells under the same facilities standards that apply to manufacturers of all other poultry products, yet Florida forbids their manufacture at all. These state-imposed limitations on the permissible ingredients in poultry products and the operations of the official establishments in which they are prepared are "in addition to, or different than" federal requirements, and thus are preempted.

Contrary to the ruling below, SB 1084 also finds no support in cases from other federal circuits upholding prohibitions on the slaughter of horses for human consumption or the production of foie gras from birds that have been force fed. Critically, the PPIA's express preemption provisions (and the analogous provisions of the FMIA) do not extend outside of "official establishments" to regulate state decisions about the treatment of animals while they are alive or about which animals may be brought to slaughter. Here, though, Florida has not forbidden the slaughter of chickens for use in making poultry

30

product, thus preventing them from coming within the USDA's regulatory ambit. Instead, Florida has chosen to forbid the manufacture, distribution, and sale of poultry products based entirely on how those products are created from parts of a poultry carcass—post-slaughter—within USDA-regulated official establishments. That is exactly what the PPIA's express preemption provisions serve to prevent, and thus UPSIDE has shown a likelihood of success on the merits.

Although the district court did not reach the issue, UPSIDE has also satisfied the remaining preliminary injunction factors. It has and will continue to suffer irreparable harm without an injunction, and neither the state of Florida nor the public is likely to be harmed by the limited distribution of products that the FDA and USDA have already determined to be safe and authorized for sale throughout the rest of the country. This Court should thus reverse the ruling below and order the district court to grant the preliminary injunction. At a minimum, the district court's erroneous preemption ruling should be corrected and the case remanded for the lower court to consider the remaining preliminary-injunction considerations in the first instance.

## ARGUMENT

## I. The District Court Erred in Concluding That UPSIDE Had Not Shown a Likelihood of Success on the Merits of Its Federal Preemption Claims.

"[A]s [the Supreme Court has] long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).[8] Although federal preemption may take several forms, the most straightforward is "express preemption," which "occurs when Congress displaces state law by so stating in express terms." *Aspen Am.*

---

[8] The district court raised some questions about whether, in this case, such claims were better pursued under § 1983 or under the Court's inherent equitable power. Doc. 40 at 13. The court ultimately did not resolve that question, because it concluded, in either case, that UPSIDE had failed to show a likelihood of success on the merits. Doc. 40 at 13. But the court invited UPSIDE to file an amended complaint clarifying that it sought to raise a cause of action in equity. Doc. 40 at 13 & n.6. Although UPSIDE maintains that its original complaint was enough to put Defendants on notice that UPSIDE sought to invoke the court's equitable power to enjoin SB 1084 on the grounds that it is preempted under federal law, UPSIDE's First Amended Complaint specifically confirms that UPSIDE brings its claims both under § 1983 and pursuant to the court's inherent equitable power. Doc. 44 at 31–53 (¶¶ 121–94).

*Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1266 (11th Cir. 2023) (cleaned up). That is exactly what the PPIA does.

In Section A, UPSIDE explains why (contra the decision below) the PPIA's express statutory preemption provisions do not turn on conflict between state and federal requirements for poultry products, but instead establishes a single federal standard that bars even nonconflicting state requirements. In Section B, UPSIDE explains why, applying those principles, SB 1084 is expressly preempted under both the "ingredients" and the "premises, facilities, and operations" provisions of 21 U.S.C. § 467e. Finally, in Section C, UPSIDE explains why state laws regulating the treatment of animals while they are alive or prohibiting the slaughter of categories of animals are different in kind from SB 1084, which reaches into and directly regulates the operations of USDA-regulated official establishments.

## A. The PPIA's express preemption provisions do not require direct conflict between state and federal requirements.

The district court's preemption ruling is based on a fundamental misunderstanding of the PPIA's preemption provisions and UPSIDE's argument under those provisions. As the district court understood it,

33

UPSIDE's preemption argument hinged on the claim that SB 1084 imposes requirements on its cultivated poultry product that are "inconsistent" with requirements imposed under federal law. Doc. 40 at 15. Under this view, Florida's prohibition on the manufacture, distribution, or sale of cultivated poultry could be preempted only if UPSIDE could point to a federal law *requiring* the manufacture of cultivated poultry or the use of cultivated poultry cells as an ingredient in poultry products. Doc. 40 at 15.

This view mistakes the PPIA's regime of express statutory preemption for one of conflict preemption. But that is not the regime that Congress created, as shown by the plain text of the PPIA. By their terms, neither of the PPIA's express preemption provisions requires that there be a conflict between state and federal law before a state requirement will be held preempted. Instead, these express preemption provisions establish that official establishments—and the articles prepared in them—will be subject to a single set of standards: the federal standard. *See N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478–79 (2018) (holding that express preemption provisions like the PPIA's "confer[] on private

34

entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints").

To be clear, UPSIDE's argument is not "if it's a poultry product, states can't ban it." Doc. 40 at 16. As explained in more detail below, the PPIA does not preempt state laws that ban poultry products based on, for example, the treatment of the chickens outside of USDA-regulated official establishments. But a state may not ban a product simply because it contains or is made from a specific ingredient (i.e., cultivated chicken cells) permitted under the PPIA or based on the use of a specific production method within a USDA-inspected official establishment (i.e., cell cultivation) permitted under the PPIA. Whether such a ban is better characterized as an ingredient requirement (in the sense that the state is banning products containing a specific ingredient/physical component) or a facilities requirement (in the sense that the state is banning the manufacture and sale of products prepared in an official establishment in a way it disapproves of, but that are permitted under applicable USDA requirements), the result is the same: States may not impose requirements on the production of poultry products in official

35

establishments that are in addition to or different than requirements imposed under federal law.

That is true even if there is no direct conflict between the state law and the PPIA. What matters is that "Congress has unmistakably ordained that the Federal Act fixes the sole standards." *Armour & Co v. Ball*, 468 F.2d 76, 84 (6th Cir. 1972) (cleaned up) (discussing the identical preemption provisions of the FMIA). And because Congress intended the PPIA to set the sole standards for the ingredients used in poultry products and the premises, facilities, and operations of official establishments that produce such products, it is irrelevant that neither Congress nor the USDA has *required* that cultivated poultry cells be used in poultry products. What they have instead required is that *all* poultry products be prepared in official establishments under the *USDA's* standards for safe manufacture, and they have determined that products prepared under those standards are suitable for sale in interstate commerce. UPSIDE's product satisfies those standards. And Florida cannot exclude that product from its borders simply because it disagrees with the federal judgment and would prefer that poultry products meet some standard that the state considers to be higher.

36

The Sixth Circuit's ruling in *Armour* is instructive. In that case, a manufacturer of sausage regulated under the Federal Meat Inspection Act challenged Michigan's Comminuted Meat Law, which governed the sale of "meat that has been subjected to a process whereby it has been reduced to minute meat particles." That definition encompassed sausage, and Michigan's law prohibited the sale within the state of any sausage that did not meet the state's definition of "grade 1" sausage. The Sixth Circuit considered various provisions of Michigan's law, ultimately holding that they were preempted under the FMIA.

Significantly, not all these provisions were in direct conflict with any federal statute or regulation governing the manufacture of sausage. For example, although federal law allowed sausage to be prepared "from any part of cattle, sheep, swine, or goats capable of use as human food," Grade 1 sausage could be prepared only from "striated muscle, including head and cheek meat (basically, skeletal meats) derived only from the carcass of any cattle, swine, or sheep, or a mixture of such meats." It was possible to comply with both the state and federal definitions of sausage; one simply had to abide by the more restrictive ingredient requirements established under state law. Yet the court held

37

that Congress's manifest intent to establish "uniform national standards" for meat products preempted Michigan's sales ban.

The same was true even where neither Congress nor the USDA had specifically spoken to an issue regulated under Michigan's law. Thus, although federal law imposed "no federal regulation governing overall moisture or protein content," Michigan's requirements for those components were held to be preempted. *Armour*, 468 F.2d at 87. Consistent with this, the Supreme Court, in examining the "premises, facilities and operations" preemption provision of the FMIA—which is material identical to that of the PPIA—held that the provision "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern an [official establishment's] facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (emphasis added).

A more recent decision involving a Vermont regulation of the labelling of products containing genetically engineered ingredients confirms this view of the PPIA's preemptive sweep. In *Grocery Manufacturers Ass'n v. Sorrell*, a coalition of food producers challenged Vermont's labelling law on the grounds that it was expressly preempted

under *both* (1) the Federal Food, Drug, and Cosmetic Act (FDCA) and the Nutrition Labeling and Education Act (NLEA), and (2) under the PPIA and FMIA. 102 F. Supp. 3d 583, 610–11 (D. Vt. 2015).

Because the scope of express preemption is determined by statutory text, the court first examined the text of the FDCA and NLEA, concluding that these provisions prohibited states only "from enacting food labeling requirements that are 'not identical' to certain *mandatory* food labeling requirements set forth in the FDCA." *Id.* at 611–12. Because the plaintiffs "acknowledge[d] that the FDA ha[d] promulgated no formal standards for GE labeling" thus could "point to no federal statute or regulation that prohibit[ed] [Vermont's] disclosure requirement, the court dismissed their claims under the FDCA and NLEA. *Id.* at 612.

But it was a different story when the court considered the broader preemption language contained in the PPIA and the FMIA, which prohibits any labelling requirements "in addition to or different than" those mandated by federal law. The USDA had not promulgated any labelling requirements for genetically engineered meat or poultry products, and thus Vermont's law did not conflict with any federal

39

requirement for those products. Even so, the court correctly held that Vermont's law "mandate[d] a . . . disclosure that [was] clearly in addition to and different than . . . requirements imposed under the FMIA and PPIA," and was therefore "expressly preempted for products subject to those federal laws." *Id.* at 620.

Those principles apply directly to this case. To show a likelihood of success on the merits, UPSIDE was not required to show that the USDA had promulgated any requirement that official establishments like UPSIDE *must* produce cultivated poultry cells or *must* include those cells in certain products, or that it was *impossible* to comply with both state and federal requirements. UPSIDE needed only to show that Florida had imposed an ingredient requirement with respect to a poultry product prepared in an official establishment, or a requirement within the scope of the PPIA with respect to premises, facilities or operations of an official establishment in which the product is made, that was not identical to that under federal law. As explained in the following section, UPSIDE has done so, and the district court's contrary holding was error.

**B.    UPSIDE demonstrated a likelihood of success for both its preemption claims**

Applying the correct standard for preemption claims under the PPIA, UPSIDE has demonstrated a likelihood of success for its claims under both the PPIA's "ingredients" provision and its "premises, facilities, or operations" provision.

***Ingredients Provision.*** UPSIDE has shown that SB 1084 imposes a requirement that is preempted by the PPIA's ingredients provision. UPSIDE's facility is an "official establishment" under the PPIA and its cultivated chicken product is an "article[] prepared at [an] official establishment in accordance with the requirements of the PPIA," 21 U.S.C. § 467e. Doc. 11-3 at 7–8 (¶¶ 26–33). UPSIDE has also shown that the USDA, acting under the authority of the PPIA, has established ingredient requirements that govern cultivated poultry products. For example, the USDA has issued a directive clarifying that cultivated poultry food products are "subject to the same statutory requirements, regulations, and FSIS oversight authority as meat and poultry food products derived from slaughter" and that "establishments that produce cells for cell-cultured meat or poultry food products may distribute the raw harvested cells in commerce or process the harvested

41

cells into finished products that contain ingredients, such as spices, flavorings, binders, or other ingredients." U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf. This same directive provides that ingredients used in cultivated meat and poultry products "must be considered safe and suitable by FSIS" and "[i]ngredients listed as approved for meat in [certain current USDA regulations and directives] may be used in cell-cultured meat food products, and ingredients listed as approved for poultry may be used in cell-cultured poultry food products . . . ." In other words, the USDA has established that cultivated poultry cells may be used as an ingredient in finished poultry products, that products containing those cells may be sold in interstate commerce, and that the agency's broader regulatory framework governing the lawful use of ingredients in poultry products applies to cultivated poultry products.

The only remaining question, then, is whether UPSIDE has shown that Florida has enacted an "ingredient requirement" that is "in addition to, or different than" the federal requirement. Plainly it has.

"Ingredient requirements" refer to "the physical components that comprise a poultry product." *Association des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017). Here, USDA has authorized the use of UPSIDE's cultivated cells as ingredients (i.e., "physical components") in poultry products. Despite this, Florida forbids UPSIDE from using this same ingredient in preparing poultry products in its official establishment. *See* Fla. Stat. § 500.03(1)(k) (defining "cultivated meat" as "any meat or food product produced from cultured animal cells"); *id.* § 500.452 (making it "unlawful for any person to manufacture for sale, sell, hold or offer for sale or distribute cultivated meat in [Florida]"). Thus, SB 1084 is expressly preempted under the "ingredients" clause of 21 U.S.C. § 467e.

*Premises, Facilities, and Operations Provision.* For similar reasons, UPSIDE has properly alleged that SB 1084 is also preempted under the PPIA's "Premises, Facilities and Operations" provision, which prohibits states from imposing "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment, which are in addition to, or different than those made under this chapter." 21 U.S.C. § 467e. The Supreme Court has expressly

43

examined the Federal Meat Inspection Act's identical clause, holding that it "sweeps widely." *Nat'l Meat Ass'n*, 565 U.S. at 459. The Court has also held that a state cannot avoid this clause "just by framing [its law] as a ban on the sale of meat produced in whatever way the State disapprove[s]." *Id.* at 464. For "[t]hat would make a mockery of the FMIA's preemption provision." *Id.* And, here, the PPIA's analogous provision applies straightforwardly to UPSIDE and its chicken product.

First, as established previously, UPSIDE has shown that its production facility is an official establishment subject to USDA inspection: UPSIDE has been issued a Grant of Inspection based on USDA's conclusion that its establishment complies with applicable USDA-FSIS regulations promulgated under the PPIA, and the establishment is subject to routine inspection by USDA-FSIS under the PPIA. UPSIDE's establishment is therefore an establishment "at which inspection of . . . the processing of poultry products, is maintained under the authority of [the PPIA]." 21 U.S.C. § 453(p). Second, UPSIDE has shown that the USDA, acting under the authority of the PPIA, has adopted a variety of requirements for premises, facilities, and operations of establishments at which cultivated chicken products are

44

manufactured. *See supra* at 9–11. Third, and finally, UPSIDE has shown that Florida has enacted requirements for premises, facilities, and operations that are "in addition to, or different than" the federal requirements. By preventing UPSIDE from manufacturing, distributing, and selling cultivated chicken that is produced in accordance with federal requirements for poultry facilities, Florida "reaches into" UPSIDE's federally regulated facility and "substitutes a new regulatory scheme for the one the FSIS uses." *Nat'l Meat Ass'n*, 565 U.S. at 460, 467.

Simply put, under the PPIA, an official establishment is permitted to receive part of a poultry carcass—its cells—and cultivate those cells for use in human food. Florida's law, however, reaches into the official establishment after it has received those cells and restricts how they may be processed: They may be processed in any manner permitted under federal law *except* cell cultivation. Thus, SB 1084 imposes "[r]equirements . . . with respect to premises, facilities and operations of any establishment at which inspection is provided under [the PPIA], which are in addition to, or different than those made under [the PPIA]." *Id.* at 460, 467 (cleaned up); 21 U.S.C. § 467e. And just as in

45

*National Meat Ass'n*, Florida cannot avoid preemption simply by "framing [its law] as a ban on the sale of meat produced in [a] way the State disapproves." 565 U.S. at 464. It's as simple as that.

### C. Cases involving the treatment of animals outside of USDA-regulated official establishments do not undermine UPSIDE's preemption claims.

Both the district court below and the government in its briefing relied heavily on a few cases upholding laws prohibiting the sale of foie gras and horsemeat to argue that SB 1084 cannot be preempted under the PPIA. Those cases differ fundamentally from this one because the sale prohibitions were not based on anything that occurred within USDA-regulated official establishments, which is the limits of the PPIA and the FMIA's preemptive scope. *Cf. Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) (observing that although Congress had the power to displace state regulations regarding the human treatment of pigs, it had not done so). Simply put, the horsemeat and foie gras laws deal with the treatment of animals while they are alive—and before they are delivered to official establishments for slaughter and subsequent processing.

46

For example, the government relies heavily on the Ninth Circuit's ruling in *Association des Éleveurs de Canards et d'Oies du Québec v. Becerra* (*Canards II*), 870 F.3d 1140 (9th Cir. 2017), which upheld a California law that forbade the force-feeding of ducks or geese as well as the in-state sale of products made elsewhere from birds that had been force fed. The Ninth Circuit held that this law was not preempted under the PPIA's ingredients clause because it regulated only an animal-husbandry practice—i.e., the treatment of animals before slaughter—and not the physical components of poultry products. Nor could the plaintiffs circumvent this conclusion by arguing that California's law prohibited the use of "force-fed livers" as an "ingredient" in poultry products. After all, "it is not the livers that are force-fed, it is the birds." *Id.* at 1149. "[T]he difference," the court observed, "is in the treatment of the birds *while alive.*" *Id.*

Florida's law is different. Unlike the law at issue in *Canards II*, Florida's law does not regulate how animals are treated when alive and before they are delivered to official establishments. Instead, Florida's law regulates whether certain poultry parts *harvested from a slaughtered bird* may be used as an ingredient in poultry products and,

47

as explained further below, how those parts may be processed for inclusion in poultry products within official establishments.

This difference matters. Indeed, as the Ninth Circuit noted in *Canards*, the USDA has repeatedly represented in legal filings that the agency "has no authority to regulate the care or feeding of birds *prior to* their arrival at the slaughter facility." *Id.* at 1148 (emphasis added).[9] For this reason, the court held that "[t]he fact that Congress established 'ingredient requirements' for poultry products that *are* produced does not preclude a state from banning products—here, for example, on the basis of animal cruelty—*well before the birds are slaughtered.*" *Id.* at 1150 (second emphasis added). But once cells have been extracted from a poultry carcass for use in making poultry products in an official establishment, they become a potential ingredient in poultry products regulated by the USDA, and a state law that disqualifies them from inclusion as an ingredient becomes an ingredient requirement.

---

[9] Presumably for this reason, the plaintiffs in *Canards* did *not* raise a claim under the PPIA's "premises, facilities, or operations" provision: None of the conduct that disqualified foie gras from sale in the state— force-feeding birds to enlarge their livers—took place in USDA-regulated official establishments.

The district court's reliance on Fifth and Seventh Circuit decisions upholding, against preemption challenges, state prohibitions on the slaughter or sale of horsemeat is similarly misplaced. Although these cases concerned the analogous "premises, facilities and operations" prong of the FMIA's preemption provision, they are different from the preemption dispute here because they concerned laws that operate "at a remove from the sites and activities that the [PPIA] most directly governs," i.e., activity within official establishments. *Nat'l Meat Ass'n*, 565 U.S. at 467. The laws at issue in the horsemeat cases categorically restricted facilities from slaughtering a specific animal species (horses) for human consumption or from receiving or processing meat sourced from that specific animal species with the intent to sell for human consumption, thus preventing those animals or meat products from arriving at official establishments in the first place. *See id.* ("When such a ban is in effect, no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance."). As the Supreme Court recognized in *National Meat Ass'n*, this is different in kind from a law that dictates how official

49

establishments may handle certain animals—or parts of animals—*after* their arrival at an official establishment. *Id.*

SB 1084 is closer to the law at issue in *National Meat Ass'n*: It does not prohibit official establishments from slaughtering chickens or other birds for human consumption or from receiving or processing poultry meat with the intent to sell for human consumption. It instead dictates how one must treat chicken parts after they are already *within* an official establishment. Under Florida law, chicken cells may enter an official establishment and be blended, mechanically separated, emulsified, steamed, fried, boiled or subject to any number of other processes while being made into finished food products. But, under SB 1084, they may not be cultivated. Thus, like the law at issue in *National Meat Ass'n*—and unlike the laws at issue in the horsemeat cases—SB 1084 does not "work at a remove" from the operations of a USDA-inspected official establishment. Rather, it strikes at the very core of what the PPIA regulates and precisely the type of interest that the PPIA facilities preemption provision forbids.

\*    \*    \*

Because SB 1084 is preempted under both the "Ingredients" and "Premises, Facilities, and Operations" Clauses of the PPIA, Plaintiff has shown a likelihood of success on the merits.

## II.  UPSIDE Carried Its Burden Under the Remaining Preliminary Injunction Factors.

Because the district court concluded the UPSIDE was unlikely to prevail on the merits of its federal preemption claims, the court denied the motion for preliminary injunction without considering the remaining preliminary injunction factors. This Court's usual practice in such cases is to remand so that the district court may evaluate those factors in the first instance. *See, e.g.*, *This That & Other Gift & Tobacco, Inc. v. Cobb County*, 285 F.3d 1319, 1324 (11th Cir. 2002). But where the movant's entitlement to a preliminary injunction is sufficiently "clear cut," this Court may order injunctive relief without remand. *See LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 954 (11th Cir. 2022).

Here, ordering injunctive relief directly is appropriate. As explained in Section A, UPSIDE showed that it has and will continue to suffer irreparable harm without an injunction. As explained in Section

51

B, UPSIDE also showed that an injunction would not harm the interests of either the state or the public. Thus, UPSIDE is entitled to a preliminary injunction against the enforcement of SB 1084.

### A. UPSIDE will be irreparably harmed without an injunction.

UPSIDE has suffered and will continue to suffer an array of irreparable harms without injunctive relief. Florida's ban on cultivated meat is backed by criminal penalties, and this Court has held that the threat of criminal prosecution constitutes irreparable harm for purposes of a preliminary injunction. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) (holding that irreparable harm existed where "Plaintiffs [were] under the threat of state prosecution for crimes that conflict with federal law").

Besides this threat of criminal punishment, UPSIDE faces a variety of concrete economic harms that are also irreparable. Although in other contexts, economic harms can often be repaired through economic damages, those damages are unavailable here because the State of Florida is immune to damages claims under the Eleventh Amendment. This Court considered precisely this situation in *Odebrecht Construction, Inc. v. Secretary, Florida Department of*

52

*Transportation*, 715 F.3d 1268 (11th Cir. 2013), another case involving federal preemption. There, this Court affirmed a preliminary injunction against enforcement of a Florida law that prohibited companies that did business with Cuba from bidding on certain government contracts in Florida. *Id.* at 1272. Along with agreeing with the district court that Florida's law was preempted by federal law, this Court also agreed that the economic harms the plaintiff faced were irreparable because the company would have "no monetary recourse against a state agency like FDOT because of the Eleventh Amendment." *Id.* at 1289. UPSIDE is in exactly the same position: It stands to suffer financial harm from Florida's ban, and it has no monetary recourse against the state. Thus, its economic harms are irreparable.

UPSIDE also stands to lose unique business opportunities and the ability to participate in one-time-only events, such as the (now already passed) 2024 Art Basel exhibition and the upcoming 2025 South Beach Wine and Food Festival, both in Miami. Once events of this sort pass, the opportunity to participate in them will be gone forever. And this Court has specifically held that the loss of unique business opportunities is a form of irreparable harm. *See Baldwin v. Express Oil*

*Change, LLC*, 87 F.4th 1292, 1311 (11th Cir. 2023) (finding irreparable harm where plaintiff "has already had to forgo at least one business opportunity . . . —one that is no longer available, so the harm from his inability to pursue it has become irreparable").

Finally, from UPSIDE's perspective, one of the most significant irreparable harms the company faces is the damage to its reputation and the lost opportunity to cultivate consumer goodwill. Florida has portrayed the company's product as something unwholesome or gross— akin to eating bugs. So long as Florida's law is in place, UPSIDE is foreclosed from having tasting events to show Florida customers that, actually, their product is wholesome and delicious. This reputational damage and loss of consumer goodwill are precisely the sort of injuries that federal courts have found irreparable in various contexts, including preemption.[10]

---

[10] *See, e.g.*, *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (holding, in a trademark infringement case, that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill"); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (holding, in a deceptive trade practices case, that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury"); *Siembra Finca Carmen, LLC* v. *Sec'y of Dep't of Agric. of P.R.*, 437 F. Supp. 3d 119, 136–37 (D.P.R. 2020) (holding, in a federal preemption case, that the

### B.    Neither the state nor the public will be harmed by an injunction.

Although UPSIDE has and will continue to suffer irreparable harm without an injunction, the state stands to suffer no harm at all if an injunction is granted. UPSIDE has shown that it has a high likelihood of success on its claim that Florida's ban is expressly preempted by the PPIA and thus unconstitutional under the Supremacy Clause. And, as this Court has repeatedly held, the state "has 'no legitimate interest' in enforcing an unconstitutional law." *Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024) (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). The Court also has expressly applied that principle to cases in which state laws were preempted by contrary federal laws.[11] Simply put, "if a state law is preempted, then the state

_____

loss of a "unique business opportunity" due to preempted laws, along with "general harm to . . . goodwill and reputation among . . . existing business partners" is irreparable harm); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 106 (S.D.N.Y. 2015) (holding, in a federal preemption case, that "[t]he threat that a business will suffer a significant loss of 'good will'—a matter not easily quantified—is particularly suited to a claim for injunctive relief").

[11] *See, e.g.*, *Odebrecht Constr.*, 715 F.3d at 1290 ("[T]he State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute.");

can suffer no harm from a court order that enjoins that law."

*Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-cv-22655, 2024 WL

2310150, at *21 (S.D. Fla. May 22, 2024).

Besides that, an injunction will not require the state to expend

any resources or obligate any funds; it will simply restore the status quo

as it existed before July 1, 2024, under which cultivated meat products

could legally be sold in Florida. Because Defendants cannot show "that

the *status quo ante* has presented a problem or injured anyone," *ABC*

*Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1311 (S.D. Fla. 2008),

Defendants have no significant interest in enforcing the ban during the

pendency of this case. This conclusion is reinforced by statements

surrounding the enactment of SB 1084—including statements by

Defendant Secretary of Agriculture Wilton Simpson—which strongly

suggest that the overriding purpose behind SB 1084 was not to protect

public health and safety but to protect Florida-based agricultural

interests from economic competition. *See supra* 16–20.

---

*Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1269 ("[E]nforcement of a
state law at odds with the federal immigration scheme is neither benign
nor equitable."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th
Cir. 2012) ("[W]e discern no harm from the state's nonenforcement of
invalid legislation.").

Restoring that status quo would also benefit the public. Because the state has no legitimate interest in enforcing an unconstitutional law, the public has a strong corollary interest in seeing that the Constitution is enforced. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (holding that "the public interest is served when constitutional rights are protected"); *see also City Walk – Urban Mission Inc. v. Wakulla County*, 471 F. Supp. 3d 1268, 1288 (N.D. Fla. 2020) (holding that "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition.").

Besides that, the public has a strong interest in the free flow of goods in the commercial marketplace. A major reason for adopting the U.S. Constitution was to ensure a national common market—in the words of Alexander Hamilton, "[a] unity of commercial, as well as political, interests." The Federalist No. 11 (Alexander Hamilton). Indeed, it is no exaggeration to say that *the* driving purpose behind the enactment of the U.S. Constitution was the desire to create a national common market. As Chief Justice John Marshall put it, after independence but before the enactment of the Constitution, states "guided by inexperience and jealousy" began enacting "iniquitous laws

and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 224 (1824). "This was the immediate cause, that led to the forming of [the Constitutional] convention." *Id.*

Simply put, consumers benefit when they are allowed to decide for themselves what goods to buy in the interstate market, and they are harmed when state governments unconstitutionally take that choice away from them. Thus, the balance of equities favors granting the injunction.

## CONCLUSION

For these reasons, Plaintiff-Appellant UPSIDE Foods, Inc. requests that this Court reverse the ruling below and grant its request for a preliminary injunction against the enforcement of SB 1084 to its cultivated poultry product. At a minimum, the district court's erroneous preemption ruling should be corrected and the case remanded for the lower court to consider the remaining preliminary-injunction considerations in the first instance.

Dated: December 16, 2024.

Respectfully submitted,

INSTITUTE FOR JUSTICE

/s/ Paul M. Sherman
Paul M. Sherman (VA 73410)
Suranjan Sen (TN 038830)
Samuel B. Gedge (VA 80387)
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
(703) 682-9320 (Telephone)
(703) 682-9321 (Facsimile)
Email: psherman@ij.org; ssen@ij.org;
         sgedge@ij.org

Ari Bargil (FL 71454)
INSTITUTE FOR JUSTICE
2 South Biscayne Boulevard, Suite 3180
(305) 721-1600 (Telephone)
(305) 721-1601 (Facsimile)
Email: abargil@ij.org

*Counsel for Plaintiff/Appellant*

59

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains <u>11,430</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated December 16, 2024.

/s/ Paul M. Sherman
*Counsel for Plaintiff/Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, I caused the foregoing *INITIAL BRIEF OF APPELLANT* to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notice and provide service of such filing on all counsel of record.

/s/ Paul M. Sherman
*Counsel for Plaintiff/Appellant*

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
# TABLE OF CONTENTS

Fla. Stat. § 500.03(1)(k) ................................................................. 1

Fla. Stat. § 500.452 ....................................................................... 2

21 U.S.C. § 467e ............................................................................ 3

i

# Fla. Stat. § 500.03(1)(k)

## § 500.03. Definitions; construction; applicability.

**(1)** For the purpose of this chapter, the term:

...

**(k)** "Cultivated meat" means any meat or food product produced from cultured animal cells.

# Fla. Stat. § 500.452

## § 500.452. Cultivated meat; prohibition; penalties.

**(1)** It is unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state.

**(2)** A person who knowingly violates this section commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

**(3)** A food establishment that manufactures, distributes, or sells cultivated meat in violation of this section is subject to disciplinary action pursuant to s. 500.121.

**(4)** In addition to the penalties provided in this section, the license of any restaurant, store, or other business may be suspended as provided in the applicable licensing law upon the conviction of an owner or employee of that business for a violation of this section in connection with that business.

**(5)** A product found to be in violation of this section is subject to s. 500.172 and an immediate stop-sale order.

**(6)** The department may adopt rules to implement this section.

# 21 U.S.C. § 467e

**§ 467e.**

**Non-Federal jurisdiction of federally regulated matters; prohibition of additional or different requirements for establishments with inspection services and as to marking, labeling packaging, and ingredients; recordkeeping and related requirements; concurrent jurisdiction over distribution for human food purposes of adulterated or misbranded and imported articles; other matters.**

Requirements within the scope of this Act with respect to premises, facilities and operations of any official establishment, which are in addition to, or different than those made under this Act may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section 11 of this Act, if consistent therewith, with respect to any such establishment. Marking, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this Act may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this Act, but any State or Territory or the District of Columbia may, consistent with the requirements under this Act, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under this Act, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States. This Act shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this Act, with respect to any other matters regulated under this Act.