No. 24-13640-C

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UPSIDE FOODS, INC.,
*Plaintiffs-Appellees*

v.

COMMISSIONER OF THE FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES WILTON SIMPSON, et al.,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of Florida, No.: 4:24-cv-00316-MW-MAF

### ANSWER BRIEF OF COMMISSIONER OF THE FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES WILTON SIMPSON

Sean T. Garner (FBN 26096)
**FLORIDA DEPARTMENT OF AGRICULTURE & CONSUMER SERVICES**
4040 Esplanade Way,
Suite 135
Tallahassee, FL 32399-7032
(850) 245-5515
Sean.Garner@fdacs.gov

Ricky L. Polston (FBN 648906)
Daniel E. Nordby (FBN 14588)
Denise M. Harle (FBN 81977)
**SHUTTS & BOWEN LLP**
215 S. Monroe St., Ste. 804
Tallahassee, FL 32301
Tel. (850) 241 -1717
RPolston@shutts.com
DNordby@shutts.com
DHarle@shutts.com

*Counsel for Commissioner Wilton Simpson*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the Certificate of Interested Persons contained in the first brief is complete.

*/s/ Daniel E. Nordby*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...................................................... C-1

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ................................................ 1

JURISDICTIONAL STATEMENT ...................................................................... 2

STATEMENT OF THE ISSUE .......................................................................... 3

STATEMENT OF THE CASE ........................................................................... 4

I.      INTRODUCTION ................................................................................ 4

II.    STATEMENT OF FACTS..................................................................... 5

        A.    The Florida Legislature's efforts to protect Floridians from a new and unproven category of food product .................................... 5

        B.    The Poultry Products Inspection Act ........................................ 6

        C.    UPSIDE, a producer of "cultivated meat" ................................ 7

III.   PROCEDURAL HISTORY .................................................................... 9

STANDARD OF REVIEW............................................................................. 10

SUMMARY OF ARGUMENT ........................................................................ 11

ARGUMENT.............................................................................................. 15

I.      UPSIDE'S MOTION FOR PRELIMINARY INJUNCTION WAS BASED ON CLAIMS THAT ARE NOW MOOTED BY UPSIDE'S FILING OF AN AMENDED COMPLAINT.................................................. 15

II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT UPSIDE IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON ITS EXPRESS PREEMPTION CLAIMS BROUGHT UNDER PPIA........ 16

        A.    Presumption against preemption................................................ 17

        B.    SB 1084 does not regulate UPSIDE's ingredients ................... 18

        C.    SB 1084 does not regulate UPSIDE's facilities ...................... 19

III.   IN ADDITION, OR IN THE ALTERNATIVE, THE DISTRICT COURT'S ORDER COULD BE AFFIRMED ON NUMEROUS INDEPENDENT GROUNDS.......................................................................... 22

# TABLE OF CONTENTS
(continued)

**Page**

A.  UPSIDE's preemption claims are not substantially likely to succeed on the merits for numerous additional reasons that the district court did not reach or initially accept ........................................... 22

    1.  The district court's order should be affirmed because the PPIA does not apply to cultivated meat ........................................ 22

    2.  The order denying the injunction may be affirmed because UPSIDE has no cause of action to assert its preemption claims ................................................................................................ 26

        a.  The PPIA expressly reserves enforcement to the United States ........................................................................ 26

        b.  UPSIDE cannot succeed on the merits of its preemption claims because the Supremacy Clause does not create a cause of action ........................................ 27

B.  UPSIDE fails to allege imminent harm sufficient for a preliminary injunction .................................................................................. 30

C.  The balance of the harms tips decidedly against UPSIDE and precludes a preliminary injunction ............................................. 34

CONCLUSION ........................................................................................ 36

CERTIFICATE OF COMPLIANCE .......................................................... 36

CERTIFICATE OF SERVICE .................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
557 F.3d 1177 (11th Cir. 2009) ................................................................. 10

*Altria Grp., Inc. v. Good,*
555 U.S. 70 (2008) ................................................................. 17

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ................................................................. 27, 28, 29

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra,*
870 F.3d 1140 (9th Cir. 2017) ................................................................. 16

*Baldwin v. Express Oil Change, LLC,*
87 F.4th 1292 (11th Cir. 2011) ................................................................. 33

*Barber v. Gov. of Ala.,*
73 F.4th 1306 (11th Cir. 2023) ................................................................. 10, 11

*Bates v. Dow Agrosciences LLC,*
544 U.S. 431 (2005) ................................................................. 17

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 n.4 (2001) ................................................................. 27

*Carson v. Monsanto Co.,*
92 F.4th 980 (11th Cir. 2024) ................................................................. 25

*Cavel Int'l, Inc. v. Madigan,*
500 F.3d 551 (7th Cir. 2007) ................................................................. 20, 21

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................. 30

*Davis v. Shah,*
821 F.3d 231 (2d Cir. 2016) ................................................................. 27

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*,
   476 F.3d 326 (5th Cir. 2007) ........................................................................ 21

*Ferrellgas Partners, L.P. v. Barrow*,
   143 F. App'x 180 (11th Cir. 2005) .............................................................. 31

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
   152 F. Supp. 3d 90 (E.D.N.Y. 2015), *aff'd in part, vacated in part*, 841
   F.3d 133 (2d Cir. 2016) ............................................................................... 32

*Golden State Transit Corp. v. City of Los Angeles*,
   493 U.S. 103 (1989) ..................................................................................... 29

*Gonzalez v. Gov. of Ga.*,
   978 F.3d 1266 (11th Cir. 2020) ................................................................... 10

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
   471 U.S. 707 (1985) ..................................................................................... 17

*House of Raeford Farms, Inc. v. SOMMA Food Grp., LLC*,
   No. 05-22-01231-CV, 2024 WL 396609 (Tex. App. Feb. 2, 2024) ........... 27

*Johnson v. 3M Co.*,
   55 F.4th 1304 (11th Cir. 2022) .............................................................. 15, 30

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ..................................................................................... 28

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ..................................................................................... 25

*Marrache v. Bacardi U.S.A., Inc.*,
   17 F.4th 1084 (11th Cir. 2021) .................................................................... 17

*McDonald's Corp. v. Robertson*,
   147 F.3d 1301 (11th Cir. 1998) .............................................................. 10, 34

*Medtronic Inc. v. Lohr*,
   518 U.S. 470 (1996) ..................................................................................... 16

*N. Am. Prods. Corp. v. Moore*,
   196 F. Supp. 2d 1217 (M.D. Fla. 2002) ..................................................... 31

*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ............................................................................. 28

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) ............................................................................. 21

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) ........................................................... 30

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. 10

*Odebrecht Constr. Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ...................................................... 32, 33

*POM Wonderful LLC v. Coca-Cola Co.*,
  573 U.S. 102 (2014) ............................................................................. 27

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ............................................................................. 17

*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017) ............................................................. 27

*Sanderson Farms, Inc. v. Tyson Foods, Inc.*,
  549 F. Supp. 2d 708 (D. Md. 2008) ..................................................... 26

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ...................................................... 10, 31

*Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Ag. of Puerto Rico*,
  437 F. Supp. 3d 119 (D.P.R. 2020) ...................................................... 32

*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020) ........................................................... 34

*United Healthcare Ins. Co. v. AdvancePCS*,
  316 F.3d 737 (8th Cir. 2002) ............................................................... 32

*Webb v. Trader Joe's Co.*,
  418 F. Supp. 3d 524 (S.D. Cal. 2019), *aff'd*, 999 F.3d 1196 (9th Cir.
  2021) .................................................................................................... 26

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) ............................................................... 11, 30

*Wyeth v. Levine,*
  555 U.S. 555 (2009) ........................................................................ 16, 17

**Rules**

11th Cir. R. 28-5 ...................................................................................... 4

11th Cir. R. 32-4 .................................................................................... 36

Fed. R. App. P. 32(a)(5) ......................................................................... 36

Fed. R. App. P. 32(a)(6) ......................................................................... 36

Fed. R. App. P. 32(a)(7)(B) .................................................................... 36

**Statutes**

21 U.S.C. § 337 ....................................................................................... 27

21 U.S.C. §§ 451-72 .......................................... 4, 6-7, 9, 11-13, 15-16, 18-24, 26-27, 29

21 U.S.C. § 453(f) ............................................................................... 6, 22

21 U.S.C. § 454(a) ................................................................................... 6

21 U.S.C. § 467c ............................................................................ 6, 26, 27

21 U.S.C. § 467e ........................................................ 7, 12, 13, 16, 18, 19, 20

28 U.S.C. § 1292(a)(1) ............................................................................. 2

42 U.S.C. § 1983 ........................................................... 9, 13, 16, 26, 29

§ 454(a), Fla. Stat. .................................................................................. 6

§ 500.02(1), Fla. Stat. ............................................................................. 5

§ 500.03, Fla. Stat. .................................................................................. 5

§ 500.03(1)(k), Fla. Stat. ........................................................................ 12

§ 500.03(k), Fla. Stat. ............................................................................. 5

§ 500.452, Fla. Stat. .............................................................................. 5

§ 500.452(1), Fla. Stat. ......................................................................... 5

§ 500.452(2), Fla. Stat. ......................................................................... 5

§ 500.452(2)-(5), Fla. Stat. .................................................................... 5

§ 500.452(5), Fla. Stat. ......................................................................... 5

Ch. 2024-137, §§ 24-25, Laws of Fla. ............................................. 4, 5

**Other Authorities**

9 C.F.R. § 424.21(c) ...................................................................... 18, 19

9 C.F.R. § 381.1(b) .................................................................... 7, 20, 22

*Florida Crossroads – It's a Law 2024: Part 3*, The Fla. Channel (Jun. 21,
2024), https://thefloridachannel.org/videos/its-a-law-2024-part-3/ ...................... 5

Cozen O'Connor, *FDA Bans Red Dye No. 3 in Food and Ingested Drugs:
What Manufacturers Should Know*, JD Supra (Jan. 31, 2025),
https://www.jdsupra.com/legalnews/fda-bans-red-dye-no-3-in-
food-and-8029682/ ........................................................................... 35

U.S. Food & Drug Admin., *Formal Agreement Between FDA and USDA
Regarding Oversight of Human Food Produced Using Animal Cell Technology
Derived from Cell Lines of USDA-amenable Species* (Mar. 7, 2019),
https://www.fda.gov/food/human-food-made-cultured-animal-
cells/formal-agreement-between-fda-and-usda-regarding-oversight-
human-food-produced-using-animal-cell ................................................ 25

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Commissioner respectfully requests oral argument and agrees with UPSIDE Foods, Inc. ("UPSIDE") that oral argument will assist the Court in deciding the important legal issued raised in this case.

## **JURISDICTIONAL STATEMENT**

This is an interlocutory appeal from the district court's October 11, 2024, order denying UPSIDE's motion for a preliminary injunction. Doc. 40. The district court "assum[ed] [without deciding that] Plaintiff's express preemption claims [were] properly before [it]," leaving open the question of subject-matter jurisdiction. *Id.* at 21. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). UPSIDE filed its notice of appeal on November 5, 2024. Doc. 46.

## <u>STATEMENT OF THE ISSUE</u>

Did the district court abuse its discretion in denying a motion for preliminary injunction against enforcement of SB 1084, a Florida law that bans the manufacture, distribution, or sale of cell-cultivated meat, on the grounds that UPSIDE failed to demonstrate a substantial likelihood of success on the merits of its claim that Florida's law is expressly preempted by the Poultry Products Inspection Act?

## STATEMENT OF THE CASE

### I.    Introduction

At issue in this appeal is a state law that protects Floridians from a new and unproven category of food product by prohibiting the manufacture, sale, or distribution of "cultivated meat" in Florida. *See* Ch. 2024-137, §§ 24-25, Laws of Fla. UPSIDE, a manufacturer of these uncertain products, challenged Senate Bill 1084 ("SB 1084") as preempted by federal law—the Poultry Products Inspection Act ("PPIA" or the "Act").

In a thoroughly reasoned order, the district court denied UPSIDE a preliminary injunction, finding that UPSIDE failed to establish it was substantially likely to succeed on the merits of its express preemption claims. Doc. 40 at 13.[1] As the district court correctly concluded, SB 1084 does not impose a requirement either for ingredients or for premises, facilities, or operations that is inconsistent with the PPIA. *Id.* at 18, 20. Moreover, the PPIA does not mandate that Florida permit the manufacture, sale, and distribution of cultivated meat; and Florida acted within its sovereign authority to regulate what meats are available within its borders for human consumption. *See id.* at 17, 20-21.

---

[1] Pursuant to 11th Circuit Rule 28-5, citations to the record are formatted [Doc. #] at [page number(s)], and paragraph numbers are indicated in a parenthetical where applicable.

## II.    Statement of Facts

### A.    The Florida Legislature's efforts to protect Floridians from a new and unproven category of food product.

The Florida Food Safety Act is intended to "[s]afeguard the public health and promote the public welfare by protecting the consuming public from injury by product use and the purchasing public from injury by merchandising deceit, flowing from intrastate commerce in food." § 500.02(1), Fla. Stat. In 2024, the people of Florida's elected representatives enacted SB 1084, which amended the Florida Food Safety Act to prohibit the manufacture, sale, or distribution of "cultivated meat." *See* Ch. 2024-137, §§ 24-25, Laws of Fla. (codified at §§ 500.03, 500.452, Fla. Stat.). SB 1084 makes it "unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." § 500.452(1), Fla. Stat. The statute defines "cultivated meat" as "any meat or food product produced from cultured animal cells." *Id.* § 500.03(k). Violations of the law can result in civil and criminal penalties. *Id.* § 500.452(2)-(5).

When considering SB 1084, Legislators expressed concern that "what we don't know is what using an immortalized cell in a human body will do in the next 25 years, and we as Floridians are not willing to allow our citizens to be used as a petri dish."[2] Legislators further reasoned that "there is no guarantee of safety for the consumer, and

---

[2] *Florida Crossroads – It's a Law 2024: Part 3*, at 12:44-55 (Rep. Daniel Antonio Alvarez Sr.), The Fla. Channel (Jun. 21, 2024), https://thefloridachannel.org/videos/its-a-law-2024-part-3/; *see* Doc. 65 at 8-9 (citing same).

the Department of Agriculture and Consumer Services has a responsibility to keep our consumers safe, and that's what [SB 1084] does."[3]

### B.    The Poultry Products Inspection Act

The PPIA is a federal law that governs the poultry trade in the United States. 21 U.S.C. §§ 451-72. The PPIA's purpose is to prevent "[u]nwholesome, adulterated, or misbranded poultry products" from entering the market and harming consumers. *Id.* § 451; *see also id.* § 452 ("Congressional declaration of policy" to "prevent the movement or sale in interstate or foreign commerce of . . . poultry products which are adulterated or misbranded"). Recognizing the historic role of States in such regulation, Congress made the non-preemptive nature of the PPIA explicit: "It is the policy of the Congress to protect the consuming public from poultry products that are adulterated or misbranded and to assist in efforts by State and other government agencies to accomplish this objective." *Id.* § 454(a). The PPIA grants the federal government the exclusive authority to enforce its provisions: "All proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States." *Id.* § 467c.

The PPIA defines "poultry product," in relevant part, as "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof." *Id.* § 453(f). Separately, "poultry food product" is defined as "any

---

[3] *Id.* at 13:04-12 (Sen. Jay Collins); *see* Doc. 65 at 8-9 (citing same).

product capable of use as human food which is made in part from any poultry carcass or part thereof." 9 C.F.R. § 381.1(b). "Carcass," under the regulation, "means all parts, including viscera, of any slaughtered poultry"; and "slaughter," in turn, "means the act of killing poultry for human food." *Id.*

Relevant to this appeal are two provisions of the PPIA: the so-called "Ingredient Clause" and "Facilities Clause." The Ingredient Clause states that "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under this chapter may not be imposed by any State . . . with respect to articles prepared at any official establishment in accordance with the requirements under this chapter." 21 U.S.C. § 467e. In turn, the Facilities Clause provides, in relevant part, that "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State." *Id.* Also in section 467e of the Act is a saving clause, expressly permitting state laws on these subjects: "This chapter shall not preclude any State . . . from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." *Id.*

### C.    UPSIDE, a producer of "cultivated meat"

UPSIDE, a California company, deems itself "among the world's leading innovators and producers of cultivated meat." Doc. 11-3 at 4 (¶ 15). According to UPSIDE, "[c]ultivated (or 'cultured') meat consists of animal cells that are grown

directly, rather than being grown inside an animal." *Id.* at 3 (¶ 10). To make its "cultivated meat," UPSIDE "acquires and banks animal cells" and places the cells in a "cultivator," where "the cells are supplied with the same sorts of nutrients that they would receive in an animal's body, which allows the cells to grow into meat." *Id.* at 3 (¶ 11). Unlike "conventional meat," "cultivated meat does not require [a] large-scale slaughter of animals." *Id.* at 4 (¶ 16).

UPSIDE manufactures what it calls "a cultivated chicken product that looks, cooks, and tastes, like a conventional boneless, skinless chicken cutlet." *Id.* at 6 (¶ 24). In November 2022, UPSIDE received a letter from the FDA indicating that it had "no questions at [that] time" regarding UPSIDE's conclusions about the production process and alleged safety of its cultivated chicken. *Id.* at 7 (¶ 28). In June 2023, UPSIDE received product labeling approval and a grant of inspection from the USDA-FSIS. *Id.* at 8 (¶¶ 30-31).

On a single occasion, and to protest SB 1084, UPSIDE distributed its "cultivated chicken product" in Miami. *Id.* at 9 (¶ 34). UPSIDE says it "had planned" to host a tasting event at the Art Basel festival in Miami in December 2024, and "had begun talks" with a chef to host a tasting event at the South Beach Wine and Food Festival in February 2025. *Id.* at 9-10 (¶¶ 38-39). UPSIDE also has a general desire to develop business relations with chefs and distributors in Florida. *Id.* at 10 (¶ 40). UPSIDE asserts that these and other efforts to distribute its "cultivated chicken product" have been halted by SB 1084. *Id.* at 10-12 (¶¶ 44-53).

### III.    Procedural History

On August 12, 2024, UPSIDE sued to enjoin enforcement of SB 1084, asserting claims that SB 1084 is preempted by the PPIA and violates the dormant Commerce Clause. Doc. 1. UPSIDE subsequently moved for a preliminary injunction, limited to its federal preemption claims under the PPIA. Doc. 11; *see also* Doc. 40 at 2 (recognizing that "the parties confirmed on the record that the only claim before this Court at the preliminary injunction stage is whether the federal Poultry Products Inspection Act (PPIA) expressly preempts Florida's ban on the sale, offer for sale, distribution, or manufacture for sale of 'cultivated meat' in Florida").

After a hearing, the district court denied the preliminary injunction on October 11, 2024. Doc. 40 at 2. As a threshold matter, the court found UPSIDE established standing as to the Commissioner, as well as the State Attorneys for the Second and Eighth Circuits. *Id.* at 12. On the merits, however, the district court, assuming without deciding that UPSIDE's express preemption claims were properly before the court under 42 U.S.C. § 1983, *id.* at 13, ruled that UPSIDE failed to establish a substantial likelihood of success on the merits, *id.* at 21. The district court held that UPSIDE's cultivated chicken product "arguably" meets the PPIA's definition of "poultry" or "poultry product," *id.* at 14, 17, but that neither the PPIA's ingredient requirement provision or its premises, facilities, and operations provision expressly preempts SB 1084, *id.* at 18, 20. Because UPSIDE failed to establish a substantial likelihood of

9

success on the merits, the district court denied the preliminary injunction without addressing the other preliminary injunction factors. *Id.* at 21.

On November 1, 2024, UPSIDE filed an amended complaint. Doc. 44. On November 5, 2024, UPSIDE appealed the order denying its motion for preliminary injunction based on the allegations in its original complaint. Doc. 46.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show (1) "a substantial likelihood of success on the merits"; (2) irreparable injury absent injunctive relief; (3) the plaintiff's threatened injury outweighs any damage the injunction may cause; and (4) "the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam). Although the first two factors are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (cleaned up). As a result, "[f]ailure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

This Court reviews the denial of "a preliminary injunction for abuse of discretion," reviewing "findings of fact of the district court for clear error and legal conclusions *de novo*." *Barber v. Gov. of Ala.*, 73 F.4th 1306, 1316 (11th Cir. 2023) (cleaned up). "[The court's] review under this standard is very narrow and deferential," *Gonzalez*

*v. Gov. of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020) (cleaned up), and "allows a range of choices for the district court, so long as any choice made by the court does not constitute a clear error of judgment." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247-48 (11th Cir. 2016) (citation omitted). In this case, the district court's denial of UPSIDE's motion for a preliminary injunction is reviewed for abuse of discretion, and its underlying legal conclusions that that neither the PPIA's ingredient requirement provision or its premises, facilities, and operations provision expressly preempts SB 1084 are reviewed *de novo. Barber*, 73 F.4th at 1316.

## SUMMARY OF ARGUMENT

The district court's order is based on narrow, but dispositive, grounds. Simply put, UPSIDE rests its preemption claims on two short clauses in the PPIA, but the plain text of those clauses has no intersection with SB 1084's language or effect. Thus, UPSIDE was not likely to prevail on the merits of its claims that the state law is expressly preempted, and it is not entitled to a preliminary injunction.

This Court should dismiss the appeal for a threshold reason: The claims upon which UPSIDE sought a preliminary injunction no longer exist; they have been superseded by UPSIDE's filing of an amended complaint, with altered claims and allegations. So this Court's review of the district court order would involve the bizarre task of considering the district court's analysis of the previewed merits of two PPIA claims that UPSIDE no longer brings in the same form. And while the amended

11

complaint—currently facing motions to dismiss—contains similar allegations, it asserts four PPIA claims rather than two and is revised in significant ways.

If reaching the merits, the Court should affirm the denial of a preliminary injunction. The district court's order is correct on two critical points. First, PPIA's so-called Ingredient Clause does not mandate consumer access to products containing lab-grown chicken. Rather, it specifies the "ingredient requirements" for "articles prepared at any official establishment in accordance with the requirements under this chapter." 21 U.S.C. § 467e. So even if PPIA applied to generally cell-cultured chicken products,[4] SB 1084 does not run afoul of the Ingredient Clause because it does not set requirements for the particular ingredients in UPSIDE's lab-grown creations. As a health-and-safety law that prohibits a general category of peculiar products for consumption in Florida, SB 1084 makes only a broad reference to "meat or food product produced from cultured animal cells" and no reference at all to what ingredients any manufacturer may put in its product. § 500.03(1)(k), Fla. Stat. The district court properly ruled that "Plaintiff has failed to demonstrate how Florida's sales ban imposes any ingredient requirement that is inconsistent with federal law." Doc. 40 at 18.

Second, and similarly, PPIA's so-called Facilities Clause is inapplicable because nothing in SB 1084 regulates UPSIDE's "premises, facilities [or] operations." 21 U.S.C.

---

[4] The Commissioner has argued and maintains that "poultry product" under the PPIA does not include lab-grown chicken. *See infra* pp. 22-24.

§ 467e. SB 1084 does not require UPSIDE to change its plants, laboratories, production methods, or use of equipment. It does not establish a regulatory regime governing UPSIDE's facility. As the district court ruled, with respect to the Facilities Clause, "Plaintiff has failed to identify any federal requirement that Florida's ban adds or differs from, such that Florida's law is expressly preempted by the PPIA." Doc. 40 at 18.

In addition, section 467e, where both the Ingredient Clause and Facilities Clause are housed, contains a saving clause, expressly permitting states to "mak[e] requirement or tak[e] other action, consistent with this chapter, with respect to any other matters regulated under [PPIA]." 21 U.S.C. § 467e. Florida's law—assuming for argument's sake that it governs "matters regulated under the PPIA"—would fall within the saving clause.

Several other grounds support denial of a preliminary injunction. For one, the PPIA does not apply to cultivated meat in the first place. In fact, there is no federal law governing cultivated meat (which, at times, UPSIDE seems to concede, *see* Doc. 38 at 30 n.15), and therefore no possibility that Florida's law could be expressly preempted. In addition, the PPIA does not provide a private right of action—it expressly reserves enforcement to the federal government. Even setting all of that aside, UPSIDE did not allege a valid basis for federal-court jurisdiction, because it asserts claims based exclusively on section 1983 and the Supremacy Clause, neither of which creates a cause of action.

13

Although the district court declined to reach the other requirements for a preliminary injunction, UPSIDE fails the imminent harm and balance-of-harms prongs, too. UPSIDE's motion asserts two insufficient and non-imminent harms: (1) hypothetical harms of speculative future business losses; and (2) alleged damage to reputation and goodwill, even though UPSIDE concedes it has no customer base or longstanding commercial relationships. These purported business harms are not imminent and do not outweigh the harm of facially enjoining a duly enacted state law guarding against consumption of suspect food products, by extraordinary relief.

## **ARGUMENT**

## I.     **UPSIDE's motion for preliminary injunction was based on claims that are now mooted by UPSIDE's filing of an amended complaint.**

The district court's evaluation of UPSIDE's (un)likely success on the merits was based on two claims in the original complaint—both of which have been superseded by an amended complaint raising *four* PPIA claims and a variety of new allegations. Doc. 44. On interlocutory appeal, this Court looks to the operative pleading that was before the district court at the time of the appealed decision. *Johnson v. 3M Co.*, 55 F.4th 1304, 1304-08 (11th Cir. 2022). And while UPSIDE still bases its lawsuit in part on claims of express preemption by the PPIA, its new factual allegations, amended legal arguments, and additional preemption claims moot the earlier pleading that the district court considered.

This Court should decline to review whether UPSIDE is substantially likely to succeed on the merits of causes of action that it no longer asserts in the same form. The task would needlessly expend resources yet provide no meaningful resolution of issues. Even if the Court were to find that the district court abused its discretion, inevitable problems would follow from the mootness: on remand, the district court would be required to redo the merits analysis either on moot claims or based on the new claims and different allegations that were not before this Court, potentially leading to another appeal on a new preliminary injunction ruling.

15

Additionally, the district court declined to decide below whether UPSIDE's PPIA claims asserted a valid cause of action at all—assuming without deciding whether UPSIDE could proceed under section 1983. So that question would have to be addressed potentially by this Court (but based on a moot complaint), and certainly by the district court, *but based on the amended complaint*, if this Court were to remand. Because of this procedural tangle, no order from this Court, aside from a simple affirmance, would provide a clear path forward for the parties and district court.

## II. The district court correctly concluded that UPSIDE is not substantially likely to succeed on its express preemption claims brought under PPIA.

UPSIDE brings its express preemption claims based on two provisions in the PPIA, neither of which conflicts with, or even directly relates to, SB 1084. In preemption analysis, "the ultimate touchstone" is Congress's intent. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Because the PPIA contains a limited express preemption clause, the district court "determine[d] the substance and scope of the clause" vis-a-vis Florida's law. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1146 (9th Cir. 2017) (citation omitted).

From the outset, these preemption claims are disfavored. As the district court determined, UPSIDE "failed to meet its burden to establish that it is substantially likely to succeed on the merits of its express preemption claims under either the 'ingredient requirement' or the 'premises, facilities, and operations requirement' provisions of 21

16

U.S.C. § 467e," Doc. 40 at 21, —neither of which contradict SB 1084's dictates. The district court did not abuse its discretion when reaching this correct conclusion to deny the preliminary injunction.

### A. Presumption against preemption

UPSIDE's asserted basis for a preliminary injunction—preemption—starts with a presumption against it on the merits. Preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up); *see also Wyeth*, 555 U.S. at 565. And if the preemptive language "is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " *Altria Grp.*, 555 U.S. at 77 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

Here, UPSIDE is claiming preemption in an area that has long been the purview of the States. "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985) (rejecting argument that local ordinance governing blood plasma was preempted by the FDA's National Blood Policy for plasma collection); *Marrache v. Bacardi U.S.A.*, Inc., 17 F.4th 1084, 1095 (11th Cir. 2021) ("Federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the

absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.") (cleaned up). Whether UPSIDE demonstrated substantial likelihood of success on the merits of its claims should be reviewed in light of this presumption, with any ambiguity construed in favor of the state law.

### B.    SB 1084 does not regulate UPSIDE's ingredients.

Below, UPSIDE "failed to demonstrate how Florida's sales ban imposes any ingredient requirement that is inconsistent with federal law." Doc. 40 at 18. The PPIA's so-called Ingredient Clause does not mandate consumer access to products with certain ingredients. Rather, that clause merely specifies the "ingredient requirements" for "articles prepared at any official establishment in accordance with the requirements under this chapter." 21 U.S.C. § 467e. SB 1084 does not run afoul of the Ingredient Clause—it does not set requirements for the particular ingredients in UPSIDE's quasi-chicken products; rather, it is a health-and-safety law that prohibits a general category of strange, unproven products for consumption in Florida. SB 1084 makes only a broad, general reference to "meat or food product produced from cultured animal cells" and no reference at all to what ingredients any manufacturer may put in its product. UPSIDE does not allege that SB 1084 conflicts in any way with codified federal ingredient regulations (which it also does not). *See* 9 C.F.R. 424.21(c) (listing ingredients "approved for use in the preparation of meat products"); *see also* Doc. 44 at 12. And UPSIDE has not identified any federal law setting an ingredient requirement for

*cultivated* meat. Doc. 40 at 16 (district court noting Plaintiff's counsel's failure to identify such a law).

As the district court explained, UPSIDE's "argument boils down to 'if it's a poultry product, states can't ban it.'" *Id.* But even assuming that UPSIDE's lab-grown product is "poultry" under the PPIA, that does not mean "a ban on the sale of a sub-category of poultry—i.e., cultivated chicken—impose[s] any 'ingredient requirement' that is inconsistent with what federal law expressly requires." *Id.* at 17. UPSIDE has not "pointed to anything other than the statutory definition of 'poultry product' to suggest that cultivated chicken must be permitted as an ingredient in any derivative poultry product." *Id.* And cell-cultured chicken is not listed in the federal regulations as one of the approved "ingredients" in "meat products." 9 C.F.R. 424. 21(c).

That section of the PPIA that includes the Ingredient Clause also contains a saving clause, expressly permitting state laws on the subject: "This chapter shall not preclude any State . . . from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." 21 U.S.C. § 467e.

## C.    SB 1084 does not regulate UPSIDE's facilities.

Similarly, the "premises, facilities, and operations" clause in the PPIA does not preempt SB 1084. As the district court simply put it, "the question boils down to whether a pure sales ban imposes inconsistent requirements on Plaintiff's premises, facilities, or operations." Doc. 40 at 18. So the so-called Facilities Clause is inapplicable

because nothing in SB 1084 regulates UPSIDE's "premises, facilities [or] operations." SB 1084 does not require UPSIDE to change its plants, laboratories, production methods, or other operations. SB 1084 contains no provisions mandating requirements for any cultivated-meat facility, let alone UPSIDE's, which is not located in Florida. But even closing facilities entirely would not be a conflict. *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007); *see* Doc. 40 at 20 ("Florida has not sought to reach into Plaintiff's facilities to tell them how they should handle their cultivated chicken cells throughout the production process and then reframed such regulations as a sales ban.").

In the district court, UPSIDE identified no federal statute or regulation governing its premises, facilities, or operations that SB 1084 conflicts with. Doc. 40 at 18. In its opening brief, UPSIDE still cannot identify one.

Section 467e's saving clause applies here, too, confirming that Florida is free to "tak[e] other action, consistent with this chapter, with respect to any other matters regulated under [the PPIA]." In any event, UPSIDE is not an "official establishment" under the PPIA, because UPSIDE does not conduct "the slaughter of poultry" or "the processing of poultry products" as defined by the Act, when it creates its cultivated-meat product from live chicken cells or egg cells. *See* 9 C.F.R. § 381.1(b). So, neither the Ingredients Clause nor the Facilities Clause—nor any part of PPIA—applies.

While no courts have yet considered UPSIDE's novel theory, at least two federal circuit courts have already rejected the argument that the Federal Meat Inspection Act (which UPSIDE invokes as "identical," Doc. 11 at 4 (¶ 10); Doc. 11-1 at 29) preempts

state laws banning a certain product. In *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, the Fifth Circuit held that a Texas law prohibiting the processing, sale, or transfer of horsemeat for human consumption was not expressly preempted by FMIA because FMIA's prohibition on states imposing different "[m]arking, labeling, packaging, or ingredient requirements" does not limit a state's ability to regulate what types of meats may be sold for human consumption. 476 F.3d 326, 333 (5th Cir. 2007). And in *Cavel International v. Madigan*, the Seventh Circuit held that the Illinois Horse Meat Act prohibiting slaughter, import, or export of horsemeat for human consumption was not expressly preempted by the FMIA because FMIA's regulation of horsemeat does not mandate that states allow horses to be slaughtered for human consumption. 500 F.3d at 553-54. UPSIDE's full-throated reliance on *National Meat Association v. Harris*, 565 U.S. 452 (2012), is misplaced. That case involved a California law regulating the treatment of nonambulatory pigs in a swine slaughterhouse. There, California's law imposed additional and different requirements on slaughterhouses than what the FMIA provided: "Where under federal law a slaughterhouse may take one course of action in handling a nonambulatory pig, under state law the slaughterhouse must take another." *Id.* at 460. There is no analogy to the PPIA and SB 1084 because the latter does not mandate what UPSIDE must do. And the unanimous Supreme Court in *National Meat Association*, mindful of *Empacadora de Carnes* and *Cavel*, emphasized that it was not calling those rulings into question: "The Circuit decisions upholding state bans on slaughtering horses [for consumption] . . . do not demand any different conclusion." *Id.* at 467.

21

III. **In addition, or in the alternative, the district court's order could be affirmed on numerous independent grounds.**

   A. **UPSIDE's preemption claims are not substantially likely to succeed on the merits for numerous additional reasons that the district court did not reach or initially accept.**

This Court may affirm on other grounds, including for the more basic reason that the PPIA does not apply to cultivated-meat products at all and that UPSIDE, relying improperly on the Supremacy Clause, does not state a valid cause of action.

   1. **The district court's order should be affirmed because the PPIA does not apply to cultivated meat.**

UPSIDE's motion for preliminary injunction rested on two claims brought under the PPIA, both meritless because the plain text of the PPIA *excludes* UPSIDE's lab-created product. The PPIA defines "poultry product," in relevant part, as "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof." 21 U.S.C. § 453(f). Separately, "poultry food product" is defined as "any product capable of use as human food which is made in part from any poultry carcass or part thereof." 9 C.F.R. § 381.1(b). "Carcass," under the regulation, "means all parts, including viscera, of any slaughtered poultry"; and "slaughter," in turn, "means the act of killing poultry for human food." *Id.*

The allegations underlying UPSIDE's motion for preliminary injunction did not state that its product is made from a "carcass" or that the cultivated cells come from a "slaughtered" bird. *See* Doc. 11 at 1 (¶ 1) ("*Unlike* conventional meat, which requires the slaughter of live animals . . ." (emphasis added)); Doc. 11-1 at 1 ("*Unlike*

22

conventional chicken, which is harvested from birds that are raised for slaughter . . ." (emphasis added)); Doc. 1 (¶ 1) ("*Unlike* conventional meat, which is harvested from animals that are raised for slaughter . . ." (emphasis added)); *id.* at 6 (¶ 22) ("cultivated meat does not require the large-scale slaughter of animals").[5] Even assuming that, years ago, UPSIDE extracted an initial cell from a carcass—a fact absent from the pleadings or briefing—that does not make its lab-grown chicken a "poultry product" as defined by the PPIA, when the cell-cultivation process involves production of a food item substantially removed from any "part" of a "carcass."

No other federal law extends the PPIA to cultivated meat. UPSIDE based its motion for preliminary injunction on an assertion that a "formal agreement" between the USDA and FDA announced "how the federal government would apply existing laws to the manufacture, distribution, and sale of cultivated meat and poultry," Doc. 11-1 at 8, and that a related federal directive "establishes standards for the use of cultivated cells in poultry products," Doc. 11 at ¶ 8. But "formal agreement" between USDA and FDA regarding cultivated meat is not binding, preemptive federal law. Nor is an agency "directive." At the preliminary injunction hearing, UPSIDE "disclaimed any reliance upon federal agency agreements to regulate cultivated meat as a basis for its express preemption claims." Doc. 40 at 16; Tr. at 7:4-17.

---

[5] UPSIDE's Amended Complaint, filed after the motion for preliminary injunction was denied and currently facing two motions to dismiss, adds no allegations about "slaughter" or the use of a "poultry carcass." Doc. 44.

All references in UPSIDE's initial brief should be ignored accordingly. *See* I.B. 2 (referencing "USDA's[] implementing regulations"); *id.* at 6 (claiming that "the USDA applies the PPIA to cultivated poultry products"); *id.* at 10-11 & n.3, 4, 6 (discussing at length and citing the *disclaimed* USDA directive and guidance); *id.* at 30 (boldly asserting that "the USDA has authorized the use of cultivated chicken cells as permissible ingredients in poultry products"); *id.* at 41 (again citing the *disclaimed* agency directive and arguing that "USDA, acting under the authority of the PPIA, has established ingredient requirements that govern cultivated poultry products"); *id.* at 42 (claiming, based on the directive it *disavowed*, that "USDA has established that cultivated poultry cells may be used as an ingredient in finished poultry products," and "the agency's broader regulatory framework governing the lawful use of ingredients in poultry products applies to cultivated poultry products"); *id.* at 43 ("USDA has authorized the use of UPSIDE's cultivate cells as ingredients (i.e., 'physical components') in poultry products").

UPSIDE's ambivalence about the lack of controlling law is a distraction. The USDA–FDA "formal agreement" is simply a policy statement resulting in no codified regulation and leaving each agency discretion to determine how it will fulfill its roles and oversight. The document describes the two agencies' "inten[tions]" and "commitment[s]" regarding food made from cultured animal cells, such as the agencies' "ongoing cooperation to refine the details regarding the[ir] respective roles" and "a joint process by which the Parties [agencies] will identify any changes needed to statutory or

regulatory authorities to effect the intended regulatory oversight."[6] And it expressly states an intent to sketch policy contours without binding either agency: "This agreement represents the broad outline of the Parties' present intent to collaborate in areas of mutual interest to HHS-FDA and USDA-FSIS. It does not create binding, enforceable obligations against either Agency."[7] Such open-ended aspirations are not law.

Likewise, the FSIS "[d]irective" and USDA "state[ment]" UPSIDE cites are not federal law. Doc. 11-1 at 10-11; I.B. 10-11 & n.3-4, 41-42. Both documents merely point back to the USDA–FDA "formal agreement" (which itself was not based on any particular congressional authority) and offer various definitions and updates. None of these agency actions complied with the Administrative Procedure Act for notice and comment in rulemaking. They "do[] not carry the force of law and cannot preempt state[]law." *Carson v. Monsanto Co.*, 92 F.4th 980, 993 (11th Cir. 2024) (en banc) (federal agency actions that did not carry force of law could not impliedly preempt state-law claim); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (even when a statute is ambiguous, courts must "independently interpret the statute," not delegate to agencies for statutory interpretation).

---

[6] U.S. Food & Drug Admin., *Formal Agreement Between FDA and USDA Regarding Oversight of Human Food Produced Using Animal Cell Technology Derived from Cell Lines of USDA-amenable Species* (Mar. 7, 2019), https://www.fda.gov/food/human-food-made-cultured-animal-cells/formal-agreement-between-fda-and-usda-regarding-oversight-human-food-produced-using-animal-cell.
[7] *Id.*

2.    **The order denying the injunction may be affirmed because UPSIDE has no cause of action to assert its preemption claims.**

UPSIDE cannot establish a substantial likelihood of succeeding on the merits of its claims for the independent reason that its motion for preliminary injunction— purportedly resting on the PPIA and the Supremacy Clause—does not identify a viable cause of action.[8] The PPIA does not create an enforceable individual right, and regardless, Congress expressly foreclosed a private right of action under PPIA. The Supremacy Clause, of course, is not a source of federal rights.

a.    **The PPIA expressly reserves enforcement to the United States.**

UPSIDE is not likely to succeed on the merits of its express preemption claims because the action it attempts to bring is foreclosed by PPIA's text. PPIA contains an express enforcement provision: only the Secretary of the U.S. Department of Agriculture may enforce violations. 21 U.S.C. § 467c ("All proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States."). No private party has a right of action under PPIA, as courts have noted. *See Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 719 (D. Md. 2008) (citing 21 U.S.C. § 467c); *see also Webb v. Trader Joe's Co.*, 418 F. Supp. 3d 524, 530

---

[8] UPSIDE attempts to plead this differently in its subsequent Amended Complaint, prompted no doubt by the district court's suggestion that UPSIDE clarify whether it is bringing claims in equity and the district court's hesitation to decide whether UPSIDE had actually asserted a valid claim under section 1983 in the original complaint. Doc. 40 at 13.

(S.D. Cal. 2019) ("[O]nly the federal government is vested with the authority to enforce the PPIA"), *aff'd*, 999 F.3d 1196 (9th Cir. 2021). The Supreme Court has held that similar statutory language precludes a private right of action. *E.g., POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109 (2014) (citing 21 U.S.C. § 337 (FDCA)); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) (only "the Federal Government" can "file suit for noncompliance" under FDCA's exclusive enforcement provision). This makes sense: the "duty to comply with federal safety regulations is a duty owed to the United States for the benefit of consumers, and commercial parties . . . cannot assert private causes of action for violations of those regulations." *House of Raeford Farms, Inc. v. SOMMA Food Grp., LLC*, No. 05-22-01231-CV, 2024 WL 396609, at *4 (Tex. App. Feb. 2, 2024) (citing 21 U.S.C. § 467c (PPIA)).

> **b.    UPSIDE cannot succeed on the merits of its preemption claims because the Supremacy Clause does not create a cause of action.**

"Both sides agree that [PPIA] does not create a private cause of action." Doc. 40 at 13. And UPSIDE cannot circumvent PPIA's lack of private right of action by invoking the Supremacy Clause, which—as UPSIDE concedes, *see id.*—also does not provide a right of action. Federal circuit courts have rejected claims by private plaintiffs that rest on an implied right of action in the Supremacy Clause. *See Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). As the Supreme Court explained in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015), "the power of federal courts of equity to enjoin unlawful executive action

[that may conflict with the Supremacy Clause] is subject to express and implied statutory limitations," and courts cannot "disregard statutory and constitutional requirements and provisions." (cleaned up). Where, as here, Congress explicitly provides for enforcement by federal officials, it implicitly precludes private enforcement.

The Supremacy Clause provides "a rule of decision," not a cause of action. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Armstrong*, 575 U.S. at 324). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong*, 575 U.S. at 324. Courts must look to the relevant federal law to make that determination. And because Article I vests broad discretion in Congress to "implement" its enumerated powers, casting the Supremacy Clause as a hook for private actors to widely enforce federal law would gut Congress's constitutional role:

> It is unlikely that the Constitution gave Congress such broad discretion with regard to the enactment of laws, while simultaneously limiting Congress's power over the manner of their implementation, making it impossible to leave the enforcement of federal law to federal actors. . . . It would be strange indeed to give a clause that makes federal law supreme a reading that *limits* Congress's power to enforce that law, by imposing mandatory private enforcement . . . .

*Armstrong*, 575 U.S. at 325-26.

UPSIDE's contrary reading invites "inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." 575 U.S. at 329 (citation omitted); *see also N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (Supremacy Clause "is

28

not an independent grant of legislative power to Congress"; a state law is preempted only if it "represent[s] the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do"); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (Supremacy Clause is "not a source of any federal rights") (citation omitted)).

UPSIDE therefore cannot invoke a general equity power in the Supremacy Clause when a federal statute bars its claims. *Armstrong*, 575 U.S. at 328 ("[R]espondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement"). Simply put, the Supreme Court's Supremacy Clause precedents "establish that a private right of action under federal law is not created by mere implication, but must be unambiguously conferred." *Id.* at 332 (cleaned up). No such conferral has occurred here, and UPSIDE cannot assert its preemption claims based on PPIA.

UPSIDE's initial complaint made passing reference to Section 1983, the Declaratory Judgment Act, and the Civil Rights Act, but none of those were mentioned in the motion below. At the hearing, UPSIDE suggested that its claims may be equitable ones; but, as the order below notes, UPSIDE did not articulate claims pursuant to an action in equity. Doc. 40 at 13 n.6. ("To the extent Plaintiff is seeking to pursue its

express preemption claims via an action in equity, it would be wise to amend its complaint to make this plain.").[9]

### B. UPSIDE fails to allege imminent harm sufficient for a preliminary injunction.

The district court did not reach this issue, because it was satisfied that UPSIDE fails the merits prong. Doc. 40 at 21. But if this Court addresses imminent harm, it should conclude that UPSIDE fails that requirement too.

"A preliminary injunction requires showing imminent irreparable harm. Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal*, 840 F.3d at 1248 (cleaned up). A plaintiff requesting an injunction must establish an immediate danger of sustaining a "concrete" and particularized injury—that is, a risk of "real and immediate" injury, not a "conjectural" or "hypothetical" future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citations omitted). "The injury must be neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (cleaned

---

[9] UPSIDE's Amended Complaint, which has not yet survived motions to dismiss, adds the phrase "[e]quitable [r]elief" and references federal courts' "inherent equitable power" in a few places. Doc. 44 at 37 (¶ 140), 41 (¶ 155), 47 (¶ 176), 53 (¶ 194). Regardless, that is not the operative pleading for this Court's review. *Johnson*, 55 F.4th at 1304-1308 (identifying third amended complaint as the "operative one" and assuming its allegations to be true when considering interlocutory appeal of immunity ruling on motion to dismiss when plaintiff filed a fourth amended complaint while appeal was pending).

up); *see also Siegel*, 234 F.3d at 1178 (affirming denial of preliminary injunction when "district court expressly found that Plaintiffs did not meet their burden of showing that immediate irreparable harm would result if preliminary injunctive relief were not entered").

What UPSIDE deems "one of the most significant irreparable harms [it] faces [—]the lost opportunity to cultivate consumer goodwill," I.B. 54—is not entitled to weight under the caselaw. That's because creation of future goodwill is wholly speculative. Instead, "[t]he focus of preliminary injunctive relief is on maintaining long standing relationships and preserving the goodwill of a company built up over the course of years of doing business." *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1230-31 (M.D. Fla. 2002); *see also id.* at 1230 (party had "legitimate business interest in protecting the substantial relationships it has with its existing customers"). UPSIDE has not alleged that it has established any longstanding business relationships or has acquired goodwill among extant customers. UPSIDE has alleged nothing in terms of actual customers or sales beyond a single "pop-up" event several months ago that was staged to protest SB 1084. Doc. 1 at 12 (¶ 50); Doc. 11-3 at 9 (¶ 34); Doc. 65-2 at 6 (¶ 8) . In short, there is no goodwill or reputation to "preserv[e]" through the extraordinary relief of a preliminary injunction. *N. Am. Prod. Corp.*, 196 F. Supp. 2d at 1230.

The cases UPSIDE cites do not show otherwise. *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 184-85, 191 (11th Cir. 2005), was a trademark infringement and unfair competition dispute between competing active propane businesses, where the

defendant competitor used a similar mark and provided the same services within the same geographical area as the plaintiff, thus threatening "the loss of control of one's reputation by the adoption of a confusingly similar mark." *United Healthcare Insurance Co. v. AdvancePCS*, 316 F.3d 737, 739-42 (8th Cir. 2002), was a deceptive trade practices dispute where there was reasonable potential for plan's participants to attribute shortcomings in a competitor pharmacy-benefit plan provider to the plaintiff, leading to "loss of reputation and goodwill among its [*existing*] customers." In *Siembra Finca Carmen, LLC. v. Secretary of Department of Agriculture of Puerto Rico*, 437 F. Supp. 3d 119, 136-37 (D.P.R. 2020), a coffee producer alleging federal preemption was likely to suffer irreparable harm when local officials "detained" its product, "caus[ing] general harm to . . . goodwill and reputation among its *existing* business partners," and at "a time when Puerto Rico's coffee farmers are still recovering from Hurricane Maria." Finally, in *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 152 F. Supp. 3d 90, 106-07 (E.D.N.Y. 2015), *aff'd in part, vacated in part*, 841 F.3d 133 (2d Cir. 2016), airport users and aviation companies brought federal preemption claims supported by evidence showing that they would experience significant business losses, including, for example, possible bankruptcy, loss of fleets, a 65% loss of flight activity, substantial layoffs, and loss of reputation and goodwill among their many *existing* clients. None of these are analogous to UPSIDE's wish to tell people about its strange new food product.

Possible future sales are not enough to establish immediate harm in the absence of steady past sales. UPSIDE's allegations are unlike the facts at issue in *Odebrecht*

*Construction Inc. v. Secretary, Florida Department of Transportation*, where this Court underscored that "[a]round 80% of Odebrecht's revenues over the years have come from public contracts in the State of Florida, and 100% of its revenues in [the preceding year] did so." 715 F.3d 1268, 1288 (11th Cir. 2013). This Court noted real business "harm" that "cannot be overstated" when "*100%* of Odebrecht's revenues, amounting to over $200 million, were derived from [now prohibited activities] in Florida" and "in the last ten years" the company had handled "nine major contracts, worth a total of $3.3 *billion*, with Florida state agencies and local governments." *Id.* Those circumstances are not, as UPSIDE argues, "precisely this situation," I.B. 52, or "exactly the same," I.B. 53, and the distinction with UPSIDE's nonexistent past sales highlights why its asserted harm is wholly speculative.

Nor is UPSIDE's inability to participate in the "one-time-only" 2025 South Beach Food and Wine Festival sufficient to state irreparable harm. UPSIDE has not made well-pled allegations showing any concrete plans for that event. UPSIDE only repeats the conclusory assertion that it "had plans," Doc. 11 at 2 (¶ 2); Doc. 11-1 at 20, and "wanted to," Doc. 11-3 at 10 (¶ 44). *See also* Doc. 1 at 12 (¶ 56) ("had planned"); *id.* at 19 (¶ 101) ("planned"). The required showing for a preliminary injunction is more than conclusory statement of future harm. And UPSIDE's citation to *Baldwin v. Express Oil Change, LLC*, I.B. 53-54, does not support its argument—the missed opportunity in that case was "at least one" offer of "productive employment" for a late-middle-age individual in a unique job industry who was challenging a non-compete agreement, 87

33

F.4th 1292, 1311 (11th Cir. 2011). Permanent gainful employment is a long way from the mere wish to set up a booth at a weekend street festival.

### C.    The balance of the harms tips decidedly against UPSIDE and precludes a preliminary injunction.

On the two remaining prerequisites for a preliminary injunction, "the balance-of-the-harms and public-interest factors . . . merge when, as here, the Government is the opposing party." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (cleaned up). The district court did not reach this factor, and this Court need not either—but, on the briefing and record to date, UPSIDE fails the requirement. As explained above, UPSIDE has not stated a cognizable irreparable or immediate harm. Balancing harm easily thus tips in favor of a duly enacted law, which comes to this Court cloaked with the presumption of constitutionality.

SB 1084 is aimed at addressing health-and-safety concerns of Floridians, who have never been exposed to strange and unproven food products like UPSIDE's. Preventing "possibility of harm to the public resulting from the possible consumption of an unsafe product" is a legitimate factor favoring the state in the preliminary injunction analysis. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 n.3 (11th Cir. 1998) (noting and not disturbing district court's consideration of possible harm from consuming unsafe products in "the balance of harms and the public interest" analysis).

UPSIDE has not suggested a valid reason why a preliminary injunction is in the public interest. "[P]ermit[ting] UPSIDE to exercise its right to bring innovative

products to the interstate market" is not enough—there is no such "right" to bring every concoction and gadget to the public. Doc. 11 at 5 (¶ 13). Besides, UPSIDE can, consistent with SB 1084, freely introduce its innovative products into the interstate market—just not Florida. Nor is a preliminary injunction in the public interest because it would "allow consumers to exercise their freedom to decide for themselves what foods they want to eat." *Id.* Consumers already have this freedom, which is regularly limited through reasonable federal and state health-and-safety regulations. And UPSIDE can posit that the public is not "likely to be harmed by the limited distribution of products that the FDA and USDA have already determined to be safe and authorized for sale,"[10] I.B. 31, but that reasoning would undermine any number of health-and-safety laws. It is Floridians' elected officials who decide whether the risk of "limited distribution of products" is worth taking.[11]

---

[10] This assertion has the additional flaw of being misleading. The agencies' "determination" that UPSIDE's cell-cultured chicken product has cleared a minimum bar for sale is not a definitive absolution of the products' health risks. *See, e.g.*, Cozen O'Connor, *FDA Bans Red Dye No. 3 in Food and Ingested Drugs: What Manufacturers Should Know*, JD SUPRA (Jan. 31, 2025), https://www.jdsupra.com/legalnews/fda-bans-red-dye-no-3-in-food-and-8029682/ (detailing the history of Red No. 3, which FDA deemed "safe" for decades before banning as harmful, and which California and several other states passed laws to ban *before* the FDA's revocation order). And as previously noted, it does not appear that USDA's asserted jurisdiction over lab-grown meat is either authorized or binding. *See supra* Section III.A.1.

[11] On this point, UPSIDE spends more than five pages speculating about non-health reasons why Florida officials may have wanted to prohibit consumption of lab-grown meat. I.B. 15-20. The complete array of legislative motivations behind the law are entirely irrelevant to the question whether federal law preempts it (or whether UPSIDE has a right of action at all).

35

## CONCLUSION

This Court should affirm.

Respectfully Submitted,

Sean T. Garner (FBN 26096)
**FLORIDA DEPARTMENT OF**
**AGRICULTURE & CONSUMER SERVICES**
4040 Esplanade Way,
Suite 135
Tallahassee, FL 32399-7032
(850) 245-5515
Sean.Garner@fdacs.gov

Ricky L. Polston (FBN 648906)
Daniel E. Nordby (FBN 14588)
Denise M. Harle (FBN 81977)
**SHUTTS & BOWEN LLP**
215 S. Monroe St., Ste. 804
Tallahassee, FL 32301
Tel. (850) 241 -1717
RPolston@shutts.com
DNordby@shutts.com
DHarle@shutts.com

*Counsel for Commissioner Wilton Simpson*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief contains 8,287 words, excluding the parts of the brief exempted by Eleventh Circuit Rule 32-4.

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Daniel E. Nordby*

## **CERTIFICATE OF SERVICE**

I certify that on March 14, 2025, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will automatically serve a copy to all counsel of record.

*/s/ Daniel E. Nordby*