No. 24-13640-C

# In the United States Court of Appeals for the Eleventh Circuit

UPSIDE FOODS, INC.,

*Plaintiff-Appellant,*

v.

COMMISSIONER OF THE FLORIDA DEPARTMENT OF
AGRICULTURE AND CONSUMER SERVICES WILTON SIMPSON,
et al.,

*Defendant-Appellees.*

**STATE ATTORNEYS' ANSWER BRIEF**

On Appeal from the United States District Court
for the Northern District of Florida
Case 4:24-cv-00316-MW-MAF

March 17, 2025

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
david.costello@myfloridalegal.com

JAMES UTHMEIER
  *Attorney General*
JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
DAVID M. COSTELLO
  *Chief Deputy Solicitor General*
BRIDGET K. O'HICKEY
  *Deputy Solicitor General*
FOSTER H. SWARTZ
  *Solicitor General Fellow*
WILLIAM STAFFORD III
  *Special Counsel*

*Counsel for the State Attorneys*

*UPSIDE Foods v. Simpson*, No. 24-13640-C

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5, Defendant-Appellees, the State Attorneys, certify that, to the best of their knowledge, the list of interested persons in Plaintiff-Appellant's initial brief is complete but for two names:

1. DeSousa, Jeffrey P.

2. Uthmeier, James

**ORAL ARGUMENT STATEMENT**

The Court should deny argument. In rejecting Appellant's claim that the Poultry Products Inspection Act preempts Florida's ban on cell-cultivated meat, Chief Judge Mark Walker joined an unbroken line of cases rebuffing similar claims. *See, e.g.*, *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra (Canards II)*, 870 F.3d 1140, 1150 (9th Cir. 2017); *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 333-35 (5th Cir. 2007); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007). Because the analysis driving that ruling is neither novel nor complicated, oral argument is unnecessary. That said, the State Attorneys stand ready to present argument should the Court find it helpful.

# TABLE OF CONTENTS

Oral Argument Statement ........................................................................ 1

Table of Contents.................................................................................... 2

Table of Authorities ............................................................................... 4

Statement of Jurisdiction...................................................................... 11

Issues Presented ................................................................................... 12

Introduction ......................................................................................... 14

Statement of the Case .......................................................................... 15

    A.    The Poultry Products Inspection Act ................................... 15

    B.    UPSIDE's cell-cultivated-meat product ............................... 17

    C.    SB 1084.................................................................................. 19

    D.    Proceedings below ................................................................ 22

Standard of Review .............................................................................. 23

Summary of Argument.......................................................................... 25

Argument .............................................................................................. 29

I.    The Court should dismiss the appeal as moot .............................. 29

II.    UPSIDE lacks a private cause of action to enforce the PPIA ....... 32

    A.    Congress has foreclosed private efforts to enforce the
          PPIA..................................................................................... 34

    B.    The PPIA's preemption provision does not create
          privately enforceable rights .................................................. 41

III.  The PPIA does not preempt SB 1084 ............................................. 46

     A.   The PPIA does not apply to UPSIDE's product because
          it is neither "poultry" nor a "poultry product" ..................... 46

     B.   Even if the PPIA did apply, the district court rightly
          held that SB 1084 does not offend the ingredients and
          facilities clauses .................................................................. 54

          1.   SB 1084 does not violate the ingredients clause ......... 54

          2.   SB 1084 does not violate the facilities clause ............. 63

Conclusion ................................................................................................. 64

Certificate of Compliance ........................................................................ 67

Certificate of Service ............................................................................... 68

3

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*31 Foster Child. v. Bush,*
  329 F.3d 1255 (11th Cir. 2003) ..................................................... 39, 40

*Alabama v. U.S. Army Corps of Eng'rs,*
  424 F.3d 1117 (11th Cir. 2005) ........................................................... 29

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ............................................................... 24, 33, 39

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .......................................................... 24, 31, 32, 35

*\*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra,*
  870 F.3d 1140 (9th Cir. 2017) ............ 1, 13, 17, 29, 48, 56-58, 62-63, 65

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ......................................................................... 58

*Bird v. Martinez-Ellis,*
  2022 WL 17973581 (10th Cir. Dec. 28, 2022) .......................... 32, 35, 37

*Blessing v. Freestone,*
  520 U.S. 329 (1997) ............................................................................. 37

*Bloedorn v. Grube,*
  631 F.3d 1218 (11th Cir. 2011) ........................................................... 23

*Boelens v. Redman Homes, Inc.,*
  759 F.2d 504 (5th Cir. 1985) ............................................................... 27

*Bollack v. City of Mitchell,*
  935 F. Supp. 1042 (D.S.D. 1996) .................................................. 42, 43

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*,
  33 F.4th 1107 (9th Cir. 2022) ............................................................. 55

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ................................................................. 34, 37

*Cavel Int'l, Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) ................................................................. 1

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) ................................................................. 31

*Davis v. Passman*,
  442 U.S. 228 (1979) ................................................................. 30

*Doe #1-#14 v. Austin*,
  572 F. Supp. 3d 1224 (N.D. Fla. 2021) ................................................................. 35

*Dream Defs. v. Governor of Fla.*,
  119 F.4th 872 (11th Cir. 2024) ................................................................. 22

*Ellis v. C.R. Bard, Inc.*,
  311 F.3d 1272 (11th Cir. 2002) ................................................................. 35, 37

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
  476 F.3d 326 (5th Cir. 2007) ................................................................. 1, 55, 56

*Evolution Fast Food Gen. P'ship v. HVFG, LLC*,
  2017 WL 4516821 (S.D.N.Y. Sept. 27, 2017) ................................................................. 55, 59, 60

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................. 58

*Fuqua v. Lindsey Mgmt. Co., Inc.*,
  321 F. App'x 732 (10th Cir. 2009) ................................................................. 31

*Golden State Transit Corp. v. City of Los Angeles*,
  493 U.S. 103 (1989) ................................................................. 42, 43

5

*Gonzaga Univ. v. Doe,
  536 U.S. 273 (2002) ............................................ 27, 33-35, 38, 40, 42-46

Gonzales v. Oregon,
  546 U.S. 243 (2006) .................................................................. 44

Grayson v. Comm'r, Ala. Dep't of Corr.,
  121 F.4th 894 (11th Cir. 2024) ................................................. 22

Hayfield N. R.R. Co. v. Chi. & N. W. Transp. Co.,
  467 U.S. 622 (1984) .................................................................. 38

Hillsborough County v. Automated Med. Laboratories, Inc.,
  471 U.S. 707 (1985) ............................................................ 13, 44

Hoefling v. City of Miami,
  811 F.3d 1271 (11th Cir. 2016) ............................................ 24, 27

House of Raeford Farms, Inc. v. SOMMA Food Grp., LLC,
  2024 WL 396609 (Tex. App. Feb. 2, 2024) ............................... 33, 40

In re Wild,
  994 F.3d 1244 (11th Cir. 2021) ............................................ 31, 37

Jones v. Tudor Cay Condo. Ass'n, Inc.,
  2023 WL 8079500 (M.D. Fla. Nov. 21, 2023) ............................... 31

La Vigne v. Costco Wholesale Corp.,
  772 F. App'x 4 (2d Cir. 2019) ................................................... 33

Leocal v. Ashcroft,
  543 U.S. 1 (2004) .................................................................... 48

Lloyd v. Sch. Bd. of Palm Beach Cnty.,
  570 F. Supp. 3d 1165 (S.D. Fla. 2021) ................................... 35, 37

Markland v. Insys Therapeutics, Inc.,
  758 F. App'x 777 (11th Cir. 2018) ............................................. 43

6

*Muscogee (Creek) Nation v. Rollin*,
119 F.4th 881 (11th Cir. 2024) ............................................ 42

*N.Y. Tr. Co. v. Comm'r of Internal Revenue*,
68 F.2d 19 (2d Cir. 1933) ....................................................51

*\*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ...........................................16, 29, 38, 56, 60-61, 65

*New Orleans Ass'n of Cemetery Tour Guides v. New Orleans
Archdiocesan Cemeteries*,
56 F.4th 1026 (5th Cir. 2023) ..................................24, 28, 29

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932) .............................................................. 13

*Phelps v. Hormel Foods Corp.*,
244 F. Supp. 3d 1312 (S.D. Fla. 2017)..................................44

*Pintando v. Miami-Dade Hous. Agency*,
501 F.3d 1241 (11th Cir. 2007)............................................29

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) .............................................................34

*Powell v. Rios*,
241 F. App'x 500 (10th Cir. 2007) ........................................29

*Reynolds v. Wal-Mart Stores, Inc.*,
2015 WL 1879615 (N.D. Fla. April 23, 2015).................................35, 59

*Rogers v. Tyson Foods, Inc.*,
308 F.3d 785 (7th Cir. 2002).................................................33

*Safe Sts. All. v. Hickenlooper*,
859 F.3d 865 (10th Cir. 2017).........................................32, 39

*Sanderson Farms, Inc. v. Tyson Foods, Inc.*,
  549 F. Supp. 2d 708 (D. Md. 2008) ..................................................33, 45

*Sinaltrainal v. Coca-Cola Co.*,
  578 F.3d 1252 (11th Cir. 2009) ............................................................30

*Standley ex rel. B.M.S. v. Nelms*,
  2024 WL 1793667 (9th Cir. Apr. 25, 2024) ..............................32, 35, 37

*Stein v. Paradigm Mirasol, LLC*,
  586 F.3d 849 (11th Cir. 2009) ..............................................................52

*Taylor v. Polhill*,
  964 F.3d 975 (11th Cir. 2020) ..............................................................38

*This That and the Other Gift and Tobacco, Inc. v. Cobb Cnty.*,
  439 F.3d 1275 (11th Cir. 2006) ............................................................23

*Union Pac. R.R. Co. v. Mason City & Ft. Dodge R.R. Co.*,
  199 U.S. 160 (1905) ..............................................................................55

*United States v. Paramount Pictures*,
  334 U.S. 131 (1948) ..............................................................................49

*United States v. Yellow Cab Co.*,
  332 U.S. 218 (1947) ..............................................................................49

*United Transp. Union v. Lewis*,
  699 F.2d 1109 (11th Cir. 1983) ............................................................32

*Utah Junk Co. v. Porter*,
  328 U.S. 39 (1946) ................................................................................49

*Webb v. Trader Joe's Co.*,
  418 F. Supp. 3d 524 (S.D. Cal. 2019) ..................................................33

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ............................................................22

8

*Zaragosa-Solis v. Gutierrez,*
  2023 WL 5380302 (9th Cir. Aug. 22, 2023)...........................................30

**Statutes**

21 U.S.C. § 337...............................................................................................34

21 U.S.C. § 451.............................................................................11, 14, 40, 41

21 U.S.C. § 452....................................................................................25, 40, 45

21 U.S.C. § 453...............................................12, 17, 25, 41, 45, 46, 47, 50

21 U.S.C. § 455...............................................................................................50

21 U.S.C. § 456...................................................................................14, 15, 40

21 U.S.C. § 466...............................................................................................50

21 U.S.C. § 467c..............................................14, 18, 27, 36, 39-41, 43

21 U.S.C. § 467e...................................... 13, 17, 29, 35, 46-47, 55-56, 64

21 U.S.C. § 674...............................................................................................36

21 U.S.C. § 678...............................................................................................56

21 U.S.C. §§ 601-95......................................................................................14

Ala. Code § 20-1-161....................................................................................18

Fla. Stat. § 500.452................................................................................20, 59

Fla. Stat. § 500.03..................................................................................20, 59

**Regulations**

9 C.F.R. § 381.1.............................................................................................51

9 C.F.R. § 381.66 ............................................................................. 50

9 C.F.R. § 381.79 ............................................................................. 50

9 C.F.R. § 381.80 ............................................................................. 50

9 C.F.R. § 424.21 ............................................................................. 58

## STATEMENT OF JURISDICTION

The State Attorneys take no issue with UPSIDE's jurisdictional statement. *See* Fed R. App. 28(b)(1).

## ISSUES PRESENTED

The Poultry Products Inspection Act (PPIA) ensures that our Nation's poultry products "are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451. To that end, the Act preempts additional or dissimilar state requirements for "ingredient[s]" used in poultry products and for "facilities" that process poultry products. *Id.* § 467e. Yet the PPIA does not "mandate" that States allow "particular types of poultry [to] be produced." *Canards II*, 870 F.3d at 1150. Nor does it preempt state laws that "work[] at a remove from the sites and activities that the [PPIA] most directly governs." *Id.* at 1152 (second alteration in original). Given those limitations, the district court held that the PPIA does not preempt Florida's ban on distributing cell-cultivated meat and denied a preliminary injunction. The questions are:

1.     Whether the appeal should be dismissed as moot because Appellant amended the complaint on which the district court's order was based before filing this appeal.

2.     Whether the district court's order should be affirmed on the alternative ground that Appellant lacks a private cause of action to enforce the PPIA, which provides that "[a]ll proceedings for the

12

enforcement or to restrain violations of [the PPIA] shall be by and in the name of the United States." 21 U.S.C. § 467c.

3.    Whether the district court's order should be affirmed on the alternative ground that Appellant's cell-cultivated-meat product is not a "poultry product" under the PPIA. 21 U.S.C. § 453(f).

4.    Whether the district court rightly held that the PPIA's ingredients and facilities clauses do not preempt Florida's cell-cultivated-meat law.

## INTRODUCTION

Florida's citizens have shielded themselves from an untested, chemically novel food product: cell-cultivated meat. A cell-cultivated-meat producer insists that it has a federal right to peddle its cell-cultured-meat prototype to Florida's people. By UPSIDE's lights, the Poultry Products Inspection Act commands nothing less.

The district court rightly rejected that claim in denying a preliminary injunction, and this Court should affirm. At the threshold, UPSIDE's appeal is moot because it has superseded the complaint that once drove its preliminary-injunction request. But even if the appeal were live, UPSIDE lacks a cause of action to enforce the Act. Nor has UPSIDE shown that the Act even governs its product, let alone that it preempts Florida's effort to safeguard its citizens from developmental food items.

As Justice Brandeis observed, it is a "happy incident[] of the federal system that a single courageous state may, *if its citizens choose*, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262,

14

311 (1932) (Brandeis, J., dissenting).[1] Yet in banning cell-cultivated meat, Florida's citizens declined to participate in UPSIDE's mystery-meat experiment. Because federal law has not foreclosed that choice, the Court should affirm.

## STATEMENT OF THE CASE

### A.    The Poultry Products Inspection Act

"[T]he regulation of health and safety matters"—including food safety—"is primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 719 (1985). But "after Upton Sinclair's muckraking novel *The Jungle* sparked an uproar over conditions in the meatpacking industry," *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012), Congress passed three statutes regulating the meat, egg, and poultry trades: the Federal Meat Inspection Act (FMIA), 21 U.S.C. §§ 601-95; the Egg Products Inspection Act (EPIA), *id.* §§ 1031-56; and most relevant here, the Poultry Products Inspection Act (PPIA), *id.* §§ 451-71.

---

[1] Unless otherwise noted, this brief omits from its authorities all quotations, citations, emphases, and alterations original to the authority. Any alterations or emphases within this brief are added.

Passed in 1957 and amended in 1968, the PPIA ensures "that poultry products . . . are wholesome, not adulterated, and properly marked, labeled, and packaged." *Id.* § 451. To achieve that aim, it fixes various standards for "slaughtering, processing, and distribut[ing] poultry products." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra (Canards II)*, 870 F.3d 1140, 1150 (9th Cir. 2017); *see, e.g.*, 21 U.S.C. § 456 (sanitary standards); *id.* § 457 (labeling standards); *id.* §§ 458-59 (prohibiting noncompliant slaughter or sale). The Act empowers the U.S. Department of Agriculture (USDA) to enforce those standards with regulations. *E.g.*, *id.* § 463.

To ensure uniform poultry processing nationwide, the PPIA also preempts some state "requirements" that "are in addition to, or different than those made under [the PPIA]." *Id.* § 467e. For example, the Act preempts additional or dissimilar state requirements governing the "premises, facilities and operations of any [PPIA-covered] establishment." *Id.* (the facilities clause). And so too additional or dissimilar state "[m]arking, labeling, packaging, or ingredient requirements" for "articles prepared at any [PPIA-covered] establishment." *Id.* (the ingredients clause).

16

Not just anyone can sue to enforce those prohibitions, though. The PPIA instead endows the federal government with exclusive enforcement authority: "All proceedings for the enforcement or to restrain violations of [the PPIA] shall be by and in the name of the United States." *Id.* § 467c.

## B.    UPSIDE's cell-cultivated-meat product

In the early 2000s—decades after Congress enacted the PPIA—researchers began developing cell-cultivated meat.[2] Cell-cultivated meat "consists of animal cells that are grown directly, rather than being grown inside an animal." DE11-3 ¶ 10. The product is in its infancy: The first cell-cultivated meat item "developed for human consumption was created in 2013," and just two companies sell the meat in the United States today. Lisa S. Benson et al., *Cell-Cultivated Meat: An Overview (CRS Report)* at ii, Cong. Rsch. Serv. (2023), https://tinyurl.com/mtmksfef; *see* DE11-3 ¶ 41.

One of those companies is Appellant UPSIDE Foods, Inc. (UPSIDE). DE11-3 ¶ 41. UPSIDE is a California-based company that has

---

[2] Neil Stephens et al., *Making Sense of Making Meat: Key Moments in the First 20 Years of Tissue Engineering Muscle to Make Food*, 3 Frontiers in Sustainable Food Sys. 1, 1 (2019), https://tinyurl.com/y63weznm.

developed a so-called "cultivated chicken product." DE1 ¶¶ 1, 41. To make that product, UPSIDE extracted cells from a "fertilized chicken egg,"[3] manipulated them to multiply indefinitely (a process called "immortalization"[4]), and "generate[d] a large master cell bank." *Supra* note 3 (in the "Cultivation Glossary" tab). To grow that cell bank into meat, UPSIDE places cells from the bank into a "cultivator"—effectively, a steel vat. *Id.*; CRS Report at 3. And once the meat cells mature, UPSIDE empties the vat, sifts through the mix to find the cells, and "mold[s]" the byproduct "into the shape of a chicken filet." *Supra* note 3 (in the "04 Prepare" tab).[5]

Although UPSIDE's product is not obviously a "poultry product" under the PPIA, *see* 21 U.S.C. § 453(f), the USDA and the Food and Drug Administration (FDA) have asserted joint jurisdiction over it. *See* Formal

---

[3] *See Innovation*, Upside Foods, https://tinyurl.com/y5wyfvfh (last visited Mar. 17, 2025) (in the "Where do you obtain your cells?" tab).

[4] Jeremiah Fasano, *Memorandum on Cell Culture Consultation 000002* (CCC Memo) at 6, FDA (2022), https://tinyurl.com/acbs7uk8.

[5] *See What the FDA Evaluated During the First Completed Pre-Market Consultation*, FDA, https://tinyurl.com/2v9ee368 (sketching out the process) (last visited Mar. 17, 2025); CCC Memo (detailing UPSIDE's process).

18

Agreement Between the USDA and FDA, (March 7, 2019), https://tinyurl.com/3cftffap. Per their agreement, the FDA supervises the process of "cell collection" and the "proliferation and differentiation of cells through the time of harvest." *Id.* at 2. The USDA, in turn, oversees the "harvest[ing]" of the cell-cultured meat and the development of that meat into a product. *Id.* at 3. The USDA, however, may not "inspect activities solely regulated by" the FDA, like the process for culturing cells. *Id.*

Following that framework, the USDA has approved one of UPSIDE's manufacturing plants for operation and authorized UPSIDE to label its product as "cell-cultivated chicken." CRS Report at 11. But the USDA has not directed States to allow UPSIDE to sell its product in their poultry markets, or even suggested that it would have the statutory authority to do so. *See id.* at 8-11.

## C.    SB 1084

Like other nascent technologies, cell-cultivated meat has sparked national and international debate. Though some herald it as a panacea for climate change and public health, *see* DE1 ¶¶ 22-27, others worry both about the unknown health consequences of ingesting immortalized

19

cells and about the erosion of traditional agricultural methods.[6] Citing those concerns, Italy and Alabama have banned cell-cultivated meat,[7] and other States have considered similar action. *See* H.B. 597, 24 Reg. Sess. (Ky. 2024); H.B. 5879, 2024 Reg. Sess. (Mich. 2024); S.B. 2870, 113th Gen. Assemb. (Tenn. 2024); H.B. 2121, 56th Leg., 2d Reg. Sess. (Ariz. 2024).

Those concerns were at the forefront during Florida's 2024 legislative session. Legislators stressed that "we don't know [what] using an immortalized cell in a human body will do in the next 25 years,"[8] and "[t]here is no guarantee of safety for the consumer."[9] Cell-cultivated meat, they said, also lacks many "bio-active compounds" that humans

---

[6] Sahar Angadjivand et al., *Regulation of Cell-Cultured Meat*, Cong. Rsch. Serv. (2018), https://tinyurl.com/484e57e4; *infra* notes 8-14 (citing the legislative debates over SB 1084).

[7] Angelo Amante, *Italy's Parliament Approves Ban on Lab-grown Food Amid Tensions*, Reuters (Nov. 16, 2023), https://tinyurl.com/m3c2j424; Ala. Code § 20-1-161.

[8] *Florida Crossroads—It's a Law 2024: Part 3* at 12:44, The Fla. Channel (June 21, 2024), https://tinyurl.com/bdf5zanf (Rep. Daniel Antonio Alvarez Sr.).

[9] *Id.* at 13:04 (Sen. Jay Collins).

derive from conventional meat.[10] By contrast, legislators noted, conventional "agriculture can hold us down and provides plenty of safe, quality beef and agricultural products." DE1 ¶ 88.[11] And since conventional meat obviates any "absolute need for [cell-cultivated meat]," legislators thought it wise to first "make sure [that the meat is] safe for the normal person" before permitting its sale.[12] Florida "has a responsibility to keep [its] consumers safe,"[13] and it would not "allow [its] citizens to be used as a petri dish."[14]

Against that backdrop, Florida enacted SB 1084. *See* Ch. 2024-137, § 25, Laws of Fla. (codified at Fla. Stat. §§ 500.452, 500.03). That law makes it "unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." Fla. Stat. § 500.452(1). It defines "[c]ultivated meat" as "any meat or food product

---

[10] *3/6/24 House Session* at 1:11:22, The Fla. Channel (Mar. 6, 2024), https://tinyurl.com/4x78trfh (Rep. Dean Black).

[11] *Id.* at 1:21:11 (Rep. Daniel Antonio Alvarez Sr.).

[12] *3/5/24 House Session* at 2:13:00, The Fla. Channel (Mar. 5, 2024), https://tinyurl.com/4pexdcc9 (Rep. Daniel Antonio Alvarez Sr.).

[13] *Supra* note 8 at 13:08 (Sen. Jay Collins).

[14] *Id.* at 12:54 (Rep. Daniel Antonio Alvarez Sr.).

produced from cultured animal cells." *Id.* § 500.03(k). Those who violate the law can face civil and criminal penalties. *Id.* § 500.452(2)-(5).

### D.    Proceedings below

SB 1084 took effect on May 1, 2024. *See* Ch. 2024-137, §§ 25, 50. Nearly three months later, UPSIDE sued Florida's Commissioner of Agriculture and several State Attorneys. DE1 (filed Aug. 12, 2024).[15] It claimed that SB 1084 is preempted by the Poultry Products Inspection Act (PPIA) and violates the Dormant Commerce Clause. *Id.* ¶¶ 119-70. UPSIDE then moved for a preliminary injunction based only on its preemption counts. *See* DE11 at 24. The State Attorneys opposed that motion because, among other things, UPSIDE lacks a cause of action, its product is not a "poultry product" under the PPIA, and SB 1084 does not impose any unlawful ingredient or facilities requirements. *See* DE65 at 11-35.

Chief Judge Mark Walker agreed with the State Attorneys and denied UPSIDE's motion on the merits. DE40 at 21. The court did not

---

[15] UPSIDE also sued Florida's Attorney General, but the district court dismissed him for lack of standing, DE40 at 5, and UPSIDE has abandoned its claims against him in its amended filings, *see* DE44 ¶¶ 10-11.

resolve whether UPSIDE has a cause of action, *id.* at 13, and it accepted that UPSIDE's product was a "poultry product," *id.* at 14-15. Yet it held that there was still no preemption because SB 1084 does not impose unlawful ingredient or facilities requirements. *Id.* at 21. SB 1084 does not offend the ingredients clause, the court held, because that clause does not bar States "from banning the sale of [a] particular kind of" poultry, like cell-cultivated meat. DE40 at 16. And the court ruled that SB 1084 does not violate the facilities clause, both because UPSIDE has no Florida-based facilities and because SB 1084's proscription does not "reach into [UPSIDE]'s facilities to tell them how they should handle their cultivated chicken cells throughout the production process." *Id.* at 19-20.

Three weeks after the district court denied UPSIDE a preliminary injunction, DE40 at 21, UPSIDE amended its original complaint, DE44. A few days later, UPSIDE appealed the denial of its preliminary-injunction motion. DE46.

## STANDARD OF REVIEW

A district court's denial of a preliminary injunction is reviewed "for abuse of discretion, a deferential standard which recognizes that the

district court usually has a range of permissible choice." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024). The court's legal conclusions are reviewed de novo, and its factual findings are reviewed for clear error. *Dream Defs. v. Governor of Fla.*, 119 F.4th 872, 876 (11th Cir. 2024).

To obtain a preliminary injunction, a party must show that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). "If [the movant] is unable to show a substantial likelihood of success on the merits," a court "need not consider the other requirements." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011).[16]

---

[16] The district court ended its inquiry after determining that UPSIDE could not show a substantial likelihood of success on the merits. DE44 at 21. Should this Court disagree with that determination, it should remand for the district court to consider the other preliminary-injunction factors in the first instance. *See, e.g.*, *This That and the Other Gift and Tobacco, Inc. v. Cobb Cnty.*, 439 F.3d 1275, 1281 (11th Cir. 2006).

## SUMMARY OF ARGUMENT

UPSIDE asked the district court to wield the Poultry Products Inspection Act—a slaughterhouse-regulation statute passed in 1968—to inject a biochemically manipulated food into Florida's poultry market. The district court rightly refused that request, and this Court should affirm its decision for four independent reasons.

**I.** This appeal is moot. UPSIDE moved for, and the district court denied, a preliminary injunction based on its original complaint. *See* DE1 (original complaint, filed Aug. 12, 2024); DE40 (preliminary-injunction order, filed Oct. 11, 2024). But after its motion was denied, and a few days before noticing this appeal, UPSIDE amended its complaint. *See* DE44 (amended complaint, filed Nov. 1, 2024); DE46 (notice of appeal, filed Nov. 5, 2024). That amendment rendered the original complaint "a legal nullity." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). And when the complaint driving an appealed order has been "nullified," the Court "cannot consider—and thus must dismiss—an appeal of a denial of injunctive relief stemming from said complaint." *New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan*

25

*Cemeteries*, 56 F.4th 1026, 1034 (5th Cir. 2023). The Court should therefore dismiss UPSIDE's appeal as moot.

**II.** Even if this Court has jurisdiction, UPSIDE lacks a cause of action to enforce the PPIA. Not only does the PPIA include no express right of action, but Congress has made clear its "intent to foreclose" private enforcement of the statute. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-29 (2015). The PPIA states in no uncertain terms: "All proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States." 21 U.S.C. § 467c. "The express provision of [that exclusive] method of enforcing" the statute shows that "Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). And even if that congressional statement did not foreclose private enforcement, nothing in the PPIA confers the privately enforceable, "personal rights" necessary to sustain a private cause of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85, 290 (2002).

**III.** On top of those jurisdictional and procedural hurdles, UPSIDE has not even shown that the PPIA applies here. The PPIA governs "poultry and poultry products." 21 U.S.C. § 452. Yet UPSIDE's cell-

cultivated offering is not a "domesticated bird, whether live or dead," so it cannot be poultry. *Id.* § 453(e). And UPSIDE's product is not "made . . . from any poultry carcass or part thereof," so it is not a poultry product either. *Id.* § 453(f). To be "made from" part of a poultry carcass, UPSIDE's product must contain part of that poultry carcass. Yet UPSIDE has not shown that its product contains any part of the original cell that it once plucked from a chicken embryo. To the contrary, the record suggests that those original cell components have been replaced by new components during the ordinary course of cell mitosis.

Even more, to qualify as a poultry product, statutory context confirms that UPSIDE's product must be made from an *appreciable part* of a poultry carcass. A single cell, however, is not an appreciable piece of poultry, like a chicken wing, breast, or beak. So UPSIDE's cell-derived chicken copycat does not trigger the PPIA's framework.

**IV.** Nor would UPSIDE prevail if it did. To do so, UPSIDE must show that SB 1084 imposes an ingredient or facilities requirement that differs from the USDA's regulatory scheme for poultry. But as the district court held, UPSIDE's ingredients-clause argument fails because the PPIA "does not preclude a state from banning products" before they enter

27

the production process. *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra (Canards II)*, 870 F.3d 1140, 1150 (9th Cir. 2017). Nor does SB 1084 even regulate a given ingredient, like poultry—it merely bars *cell-cultivation* as a food-production technique, and a technique is not an ingredient. *See id.* at 1149.

UPSIDE's facilities-clause argument fares no better. That clause stops Florida from imposing any dissimilar requirements for UPSIDE's "premises, facilities [or] operations." 21 U.S.C. § 467e. Yet as UPSIDE "concedes," SB 1084 applies only to businesses within Florida's borders, and UPSIDE "does not manufacture cultivated chicken in Florida." DE40 at 19. Plus, even if UPSIDE could scale that geography problem, SB 1084 in no way addresses how UPSIDE must operate its facilities. SB 1084 instead "works at a remove from the sites and activities that the [PPIA] most directly governs," *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 467 (2012), and thus comes nowhere near the facilities clause's preemptive trigger.

28

## ARGUMENT

## I. The Court should dismiss the appeal as moot.

UPSIDE's appeal of the district court's preliminary-injunction order is moot because UPSIDE chose to amend the complaint on which that order was based. Indeed, UPSIDE centered its preliminary-injunction request around its original complaint. *Compare* DE11-1, with DE1. Yet after the district court denied UPSIDE's motion, but *before* UPSIDE noticed its appeal, UPSIDE amended that complaint. *Compare* DE40 (preliminary-injunction order, filed Oct. 11, 2024), DE44 (amended complaint, filed Nov. 1, 2024), and DE46 (notice of appeal, filed Nov. 5, 2024).

That amendment "supersede[d] the original and render[ed] it of no legal effect, unless the amended complaint specifically refer[red] to or adopt[ed] the earlier pleading." *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985); *accord Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("[W]hen [plaintiff] filed the second amended complaint, the first amended complaint (and its attached exhibits) became a legal nullity."). But UPSIDE's amendment did not specifically refer to or adopt its original complaint. *See* DE 44. As a result, the

29

amendment rendered the original complaint a "legal nullity" and wiped away the operative complaint driving the district court's preliminary-injunction order.

As the Fifth Circuit has held, that moots UPSIDE's appeal of the preliminary-injunction order. *See New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1034 (5th Cir. 2023). In *Cemetery Tour Guides*, the plaintiff moved for a preliminary injunction based on its first amended complaint, which was denied. *Id.* at 1031. After the denial—but before noticing its appeal from the denial—the plaintiff amended its complaint without referencing the prior complaint. *See id.* at 1031, 1033. Given that posture, the Fifth Circuit dismissed the appeal as moot with ease. The first amended complaint, the court said, "is a legal nullity because it was not incorporated by the subsequent second amended complaint." *Id.* at 1033. And "[b]ecause the first amended complaint [wa]s nullified," the court could not "consider—and thus [had to] dismiss—an appeal of a denial of injunctive relief stemming from said complaint." *Id.* at 1034.

This Court's precedents support a similar analysis. The Court has long recognized that "[a]n amended pleading supersedes the former

30

pleading," such that "the original pleading is *abandoned* by the amendment, and is no longer a part of the pleader's averments against his adversary." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). And the Court has held that "injunctive relief must relate in some fashion to the relief requested *in the complaint*." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005). Putting those holdings together, when there's no complaint, no injunctive relief can be granted. *Accord Powell v. Rios*, 241 F. App'x 500, 505 n.4 (10th Cir. 2007). That is exactly the situation UPSIDE has created here.

UPSIDE cannot protest that "the nullified and amended complaints are sufficiently similar," for the Fifth Circuit has explained why substantive similarities are irrelevant. *Cemetery Tour Guides*, 56 F.4th at 1034. "To hear an appeal on a nullified, legally inoperative document is to impermissibly adjudicate a moot case," no matter the complaints' substantive similarities. *Id.* Article III thus requires this Court to dismiss UPSIDE's appeal as moot. *See also Zaragosa-Solis v. Gutierrez*, 2023 WL 5380302, at *1 (9th Cir. Aug. 22, 2023) ("[T]he amendment of a complaint on which an interlocutory appeal is based moots the appeal, even if the

amended complaint is substantively the same, because the prior complaint becomes a legal nullity[.]").

## II.    UPSIDE lacks a private cause of action to enforce the PPIA.

Even if this appeal were not moot, UPSIDE has no "cause of action" to enforce the PPIA. *See Davis v. Passman*, 442 U.S. 228, 239 (1979) (plaintiffs must have a cause of action to enforce a statute preemptively).[17] Because the PPIA contains no express private cause of action, there are only three possible avenues to enforce the PPIA: (1) an implied cause of action under the PPIA, (2) a cause of action under Section 1983, and (3) an equitable cause of action for preemption. *See In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc) (discussing implied statutory causes of action); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002) (Section 1983); *Armstrong v. Exceptional Child Ctr., Inc.*,

---

[17] Though the district court did not resolve whether UPSIDE has a cause of action, *see* DE40 at 13, this Court has may "address pure questions of law on appeal, even if such questions are not resolved by the district court." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1269 n.19 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). Because UPSIDE's likelihood of success turns on whether it can raise a PPIA preemption claim in the first place, this Court should exercise its discretion to resolve that procedural question first.

575 U.S. 320, 326-27 (2015) (equity).[18] "Both sides agree," however, "that the Poultry Products Inspection Act does not [imply] a private cause of action." DE40 at 13. And as the district court explained, "it [is not] clear that Plaintiff has even alleged its claims pursuant to a cause of action in equity." *Id.*[19]

But even if UPSIDE had alleged both an equitable cause of action and a cause of action under Section 1983, both avenues are barred for the same two reasons. First, Congress has made clear its "intent to foreclose" private enforcement of the PPIA. *See Armstrong*, 575 U.S. at 326-29 (explaining that rule for equity-based causes of action); *Gonzaga*, 536

---

[18] UPSIDE also cited the Supremacy Clause and the Declaratory Judgment Act as possible sources for a cause of action. DE1 ¶ 6. But UPSIDE later disclaimed "that the Supremacy Clause creates a cause of action." *See* DE40 at 13. And as the district court held, "the Declaratory Judgment Act does not create a cause of action, but instead creates a remedy." *Id.*; *see Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012).

[19] UPSIDE mentioned equity only once in its original complaint, requesting "such further legal and equitable relief as the Court may deem just and proper." DE1 at 31, ¶ 4. Courts "should not divine causes of action when they are not stated." *Jones v. Tudor Cay Condo. Ass'n, Inc.*, 2023 WL 8079500, at *4 (M.D. Fla. Nov. 21, 2023), so this Court should not consider UPSIDE's equitable cause-of-action theory on appeal when it did not state one in its complaint. *See Fuqua v. Lindsey Mgmt. Co., Inc.*, 321 F. App'x 732, 734 (10th Cir. 2009).

U.S. at 284 n.4 (same for Section 1983). Second, the PPIA's preemption provision does not endow UPSIDE with the "personal rights" necessary to have a cause of action. *Id.* at 284-87 (explaining that rule for Section 1983); *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 899-904 (10th Cir. 2017) (same for equity).

### A. Congress has foreclosed private efforts to enforce the PPIA.

**1.** When a statute's text shows that Congress "inten[ded] to foreclose" private litigants from enforcing it, neither Section 1983 nor equity provides a path to relief. *Armstrong*, 575 U.S. at 326-29; *Gonzaga*, 536 U.S. at 284 n.4. That intent is clear when Congress "express[ly] provi[des]" that only the government may enforce the statute. *Standley ex rel. B.M.S. v. Nelms*, No. 22-35833, 2024 WL 1793667, at *3 (9th Cir. Apr. 25, 2024); *see Bird v. Martinez-Ellis*, No. 22-8012, 2022 WL 17973581, at *5 (10th Cir. Dec. 28, 2022); *United Transp. Union v. Lewis*, 699 F.2d 1109, 1113 (11th Cir. 1983) (Because the statute "provides that penalties for violations . . . can be recovered in an action brought by the U.S. attorney[, n]o mechanism for private enforcement of [it] exists[.]").

So it is here. UPSIDE seeks to enforce the PPIA's preemption provision. *See* 21 U.S.C. § 467e. But only the United States may enforce

that provision. The PPIA provides that "[a]ll proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States." *Id.* § 467c. Because the preemption provision is part "of this chapter"—i.e., of the PPIA—"[a]ll proceedings" to "enforce[]" or "restrain violations of" it must be initiated by "the United States." *See id.* "The express provision of [that exclusive] method of enforcing" the statute shows that "Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

That conclusion is hardly novel. Every court to consider the issue has held that "only the federal government is vested with authority to enforce the PPIA." *La Vigne v. Costco Wholesale Corp.*, 772 F. App'x 4, 6 n.3 (2d Cir. 2019).[20] The United States has represented as much in legal filings: "[T]he PPIA has no private right of action and explicitly reserves enforcement powers to the federal government." Brief for the United States as Amicus Curiae, *La Vigne*, No. 18-415, 2019 WL 1723825, at *16.

---

[20] *See Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002) ("[T]he PPIA does not create a private right of action."); *Webb v. Trader Joe's Co.*, 418 F. Supp. 3d 524, 530 (S.D. Cal. 2019) (same); *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 719 (D. Md. 2008) (same); *House of Raeford Farms, Inc. v. SOMMA Food Grp., LLC*, No. 5:22-cv-1231, 2024 WL 396609, at *4 (Tex. App. Feb. 2, 2024) (same).

The federal government has "the *sole authority* to enforce its prohibitions." *Id.* at *5.

That premise is inescapable given how the Supreme Court has construed the same enforcement provision in a similar food statute: the Food, Drug, and Cosmetic Act (FDCA). Save for a few exceptions, the FDCA provides that "all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). That language, the Supreme Court has held, "leaves no doubt that it is the Federal Government rather than private litigants who are authorized" to enforce the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001); *see POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109 (2014) (same). Courts have thus long recognized that "no private right of action exists for a violation of the FDCA." *Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272, 1284 n.10 (11th Cir. 2002); *see Doe #1-#14 v. Austin*, 572 F. Supp. 3d 1224, 1234 n.12 (N.D. Fla. 2021). And they have rejected efforts to sidestep Congress's intent by enforcing the FDCA through other legal sources, like Section 1983 or equity. *See Standley*, 2024 WL 1793667, at *3; *Bird*, 2022 WL 17973581, at *5; *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp.

3d 1165, 1175-76 (S.D. Fla. 2021); *cf. Reynolds v. Wal-Mart Stores, Inc.*, 2015 WL 1879615, at *9 (N.D. Fla. April 23, 2015). The same analysis applies to the PPIA.

Congress barred private efforts to enforce the PPIA for good reason. As UPSIDE has noted, the PPIA's goal "was to facilitate a uniform, nationwide market of safe poultry products." DE1 ¶ 122. By entrusting the United States with "the sole authority to enforce its prohibitions," Brief for the United States as Amicus Curiae, *La Vigne*, No. 18-415, 2019 WL 1723825, at *5, Congress ensured "uniformity" in how that complex food-safety framework is applied and avoided the "inconsistent interpretations and misincentives that can arise [from] inappropriate application of the statute in a private action." *Gonzaga,* 536 U.S. at 292 (Breyer, J., concurring in judgment); *see Armstrong*, 575 U.S. at 328-29.

**2.** Though UPSIDE has not addressed its cause-of-action problems on appeal, its lower-court arguments were unpersuasive. It first pointed to *National Meat Ass'n v. Harris*, *see* DE36-1 at 4 n.1, but that case only solidifies our cause-of-action analysis. Private plaintiffs there prevailed on a claim that the FMIA's preemption clause preempted a state law regulating pork production. *Nat'l Meat*, 565 U.S. at 455. Though the

37

FMIA's preemption clause resembles the PPIA's, there is a critical difference: The FMIA does not expressly assign enforcement of the relevant "chapter" to the *exclusive* province of the federal government. *Compare* 21 U.S.C. § 467c (PPIA), *with* 21 U.S.C. § 674 (FMIA). Rather, the FMIA omits the PPIA's broad directive that only the federal government may enforce its provisions (including its preemption provision), and instead confines the federal government's exclusive enforcement authority to condemnation proceedings. *See id.* § 673(a)(4) ("All [condemnation] proceedings shall be at the suit of and in the name of the United States."). That difference only underscores the breadth of the exclusive enforcement provision in the PPIA.

UPSIDE next claimed that Congress did not foreclose a private right of action because the PPIA does not provide a comprehensive scheme for relief. *See* DE60 at 34. But here, the point is that the statutory scheme forecloses relief not implicitly in its magisterial comprehensiveness, but by a straightforward, explicit congressional command that "[a]ll proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States." 21 U.S.C. § 467c. When such express statements exist, the Court

need not search for a comprehensive enforcement scheme to discern Congress's intent. *See Gonzaga*, 536 U.S. at 284 n.4; *In re Wild*, 994 F.3d at 1259. That is why courts construing the FDCA's identically worded enforcement provision have not asked whether a comprehensive enforcement scheme exists before determining that the FDCA forecloses private enforcement. *See Buckman*, 531 U.S. at 349 n.4; *Ellis*, 311 F.3d at 1284 n.10; *Standley*, 2024 WL 1793667, at *3; *Bird*, 2022 WL 17973581, at *5; *Lloyd*, 570 F. Supp. 3d at 1175-76. And even if a "comprehensive enforcement scheme" were required, *Blessing v. Freestone*, 520 U.S. 329, 341 (1997), a law mandating that "[a]ll proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States" is surely comprehensive, 21 U.S.C. § 467c.

Unable to surmount those authorities, UPSIDE tried to wave them away on the ground that they "involve[d] lawsuits by private parties against other private parties." DE60 at 36. But that too is wrong. *Standley*, *Bird*, and *Lloyd* all involved a private party suing a government actor. And those courts all held that the FDCA's identical exclusive enforcement provision foreclosed private lawsuits.

Finally, UPSIDE claimed that its preemption theory fell beyond Section 467c because "a law that is preempted under the PPIA is not a 'violation' of the PPIA." DE36-1 at 15. That is both incorrect and irrelevant. It is incorrect, of course, because a law is preempted *only if* it violates federal law—here, the PPIA's preemption provision. *See Hayfield N. R.R. Co. v. Chi. & N. W. Transp. Co.*, 467 U.S. 622, 627 (1984); *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020).[21] And it is irrelevant, too, because Section 467c provides quite broadly that "[a]ll proceedings for the *enforcement* . . . of [the PPIA] shall be by and in the name of the United States." 21 U.S.C. § 467c. If UPSIDE is not suing to restrain a violation of the PPIA, *and* it is not suing to enforce the PPIA, one struggles to say what it is suing for.

---

[21] UPSIDE's First Amended Complaint concedes as much. There, UPSIDE bases its equitable cause-of-action theory on the proposition that "[f]ederal courts have the inherent equitable power to grant injunctive relief against state officers who are *violating*, or planning to *violate*, federal law." DE44 ¶ 140. The federal law that UPSIDE claims is violated here is the PPIA. Yet Section 467c says that only the United States may "restrain violations" of the PPIA. 21 U.S.C. § 467c.

**B.    The PPIA's preemption provision does not create privately enforceable rights.**

UPSIDE lacks a cause of action for another reason: The PPIA's preemption provision does not create privately enforceable, "personal rights." *Gonzaga*, 536 U.S. at 284-85. Whether suing in equity or under Section 1983, the plaintiff must come armed with a federal law endowing it with privately enforceable rights. *See id.* (Section 1983); *see Hickenlooper*, 859 F.3d at 899-904 (same for equity). To grant enforceable rights, though, a statute "must do so in clear and unambiguous terms." *Gonzaga*, 536 U.S. at 290. The statute must do more than "focus on the person[s] regulated," *Alexander*, 532 U.S. at 289; "its text must be phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 284. A statute does not do that when it has an "aggregate, not individual, focus." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003).

That is the case for the PPIA. Nothing in the statute suggests that Congress intended that it benefit producers like UPSIDE. If anything, the PPIA benefits *consumers* by protecting them from producers like UPSIDE. *See SOMMA*, 2024 WL 396609, at *4 (The PPIA imposes "duties" on producers.).

41

Congress passed the PPIA to "protect the health and welfare of consumers" by "assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451; *see id.* § 452. To that end, the Act speaks of the U.S. Government's power to inspect poultry producers' establishments, *id.* § 455(a)-(b); condemn their products, *id.* § 455(c); set sanitation standards for their facilities, *id.* § 456; prescribe storage, handling, and labeling requirements for their goods, *id.* §§ 457, 463(a); and sue producers in court, *id.* § 467c. Not once are the "rights" of poultry producers mentioned. Rather, the statute has an "aggregate" focus on the commercial field that it regulates. *31 Foster Child.*, 329 F.3d at 1274. The PPIA thus lacks the "clear and unambiguous terms" needed to endow UPSIDE with substantive rights. *Gonzaga*, 536 U.S. at 290.

UPSIDE offered no persuasive rebuttal to that argument in the district court. It first argued that the PPIA's statement of findings endowed poultry producers with enforceable rights by noting that "[u]nwholesome, adulterated, or misbranded poultry products . . . result in sundry losses to poultry producers and processors of poultry and poultry products." DE60 at 31; 21 U.S.C. § 451. But that statement does

not "unambiguously" prove that "Congress intended to create a federal right" for the very producers that the PPIA regulates. *Gonzaga*, 536 U.S. at 283. Read against the backdrop of the PPIA's many consumer-protection provisions, that statement merely acknowledges another way in which haphazard poultry practices harm *consumers*: by spoiling poultry harvests and "destroy[ing] markets for wholesome" poultry products. 21 U.S.C. § 451.[22]

UPSIDE's reference to *New Jersey Thoroughbred Horsemen's Association v. National Collegiate Athletic Association* was even farther afield. 584 U.S. 453 (2018). UPSIDE cited the case for the premise that "the PPIA's preemption provision 'confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints.'" DE36-1 at 16 (quoting *Horsemen's Ass'n*, 584 U.S. at 478-79). But *Horsemen's Ass'n* was an anti-commandeering case, not a cause-

---

[22] It is not even clear that UPSIDE qualifies as a "processor[] of poultry" under the statute. Although the term "poultry processor" is undefined in the PPIA, "processed" means "slaughtered, canned, salted, stuffed, rendered, boned, cut up, or otherwise manufactured or processed." 21 U.S.C. § 453(w). UPSIDE does not do any of that to chickens—that is its *raison d'être*. UPSIDE would thus seem not to come within the scope of the "sundry losses" language on which it relies.

of-action case, so its discussion says nothing of whether preemption provisions invariably create the privately enforceable rights necessary to establish a cause of action. *See Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 890 (11th Cir. 2024) (To determine "the authority of precedent," this Court "consider[s] its context, including the question the court was answering, the parties' arguments, and [the] facts of the case.").

To the contrary, the Supreme Court has held for decades that preemption provisions *do not* invariably grant privately enforceable rights. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110-13 (1989); *see also Bollack v. City of Mitchell*, 935 F. Supp. 1042, 1045-46 (D.S.D. 1996) (surveying that line of authority). Hewing to the *Gonzaga* standard, the Court has instead held that a preemption provision grants privately enforceable rights only if it is best read to "den[y] [the] sovereign the authority to abridge a personal liberty." *Golden State*, 493 U.S. at 112; *see Bollack*, 935 F. Supp. at 1045-46. By contrast, when the preemption provision is better read as an effort to "maintain[] uniformity in the administration of the federal regulatory

[scheme]," the provision grants no privately enforceable rights. *Golden State*, 493 U.S. at 110-12; *Bollack*, 935 F. Supp. at 1046.

Context from both Section 467e and the rest of the PPIA makes clear that the preemption provision is not designed to protect personal liberties, but to administer a complex federal food-safety framework. The PPIA therefore does not supply the "clear and unambiguous" statement that UPSIDE needs to establish a private right to enforce the very statute that regulates it. *Gonzaga*, 536 U.S. at 290.

*    *    *

"Congress made a specific choice to allow only the government to enforce the [PPIA's] requirements, and allowing private litigants to sue . . . would conflict with that policy decision." *Markland v. Insys Therapeutics, Inc.*, 758 F. App'x 777, 779 (11th Cir. 2018) (construing the FDCA). UPSIDE may raise its preemption concerns "with [the] USDA directly." Brief for the United States as Amicus Curiae, *La Vigne*, No. 18-415, 2019 WL 1723825, at *16-17. Or it may assert them to defend against a lawsuit. *See Phelps v. Hormel Foods Corp.*, 244 F. Supp. 3d 1312, 1315-16 (S.D. Fla. 2017) (asserting PPIA preemption defensively).

But it lacks a cause of action to enforce the PPIA preemptively, so its preemption claim must fail.

## III. The PPIA does not preempt SB 1084.

Even if UPSIDE had a cause of action, SB 1084 is not preempted. Courts do not lightly conclude that Congress has invaded "areas traditionally supervised by the States' police power," *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006), like their power to regulate food safety, *see Hillsborough County*, 471 U.S. at 719. UPSIDE has offered no persuasive reason to think that Congress did so here. To begin with, UPSIDE has not shown that the PPIA even applies to its cell-cultivated-meat product. Nor has UPSIDE established that SB 1084 implicates the PPIA's preemption clauses.

### A. The PPIA does not apply to UPSIDE's product because it is neither "poultry" nor a "poultry product."

The PPIA's preemption provision applies only to state requirements that implicate "the [USDA's] authority" under the PPIA. *Sanderson Farms*, 549 F. Supp. 2d at 719; *see* 21 U.S.C. § 467e (PPIA's preemption provision applies to matters "within the scope of [the PPIA]."). That authority extends to regulating "poultry and poultry products." *Id.* § 452;

*see Canards II*, 870 F.3d at 1150. So to fall within the PPIA's scope, UPSIDE's product must be poultry or a poultry product.

UPSIDE's product is neither. Starting with poultry, the PPIA defines "poultry" as "any domesticated bird, whether live or dead." 21 U.S.C. § 453(e). When the PPIA was passed, a "bird" was a "warm-blooded vertebrate[]" that was "more or less completely covered with feathers." Bird, *Webster's New International Dictionary* 272 (2d ed. 1950) (*Webster's Second*). Yet UPSIDE does not produce feathered vertebrates; it produces cell-grown chicken meat that mimics a conventional "chicken cutlet." DE11-3 ¶ 24. Whatever that is, it is not a "domesticated bird." 21 U.S.C. § 453(e).

Nor is it a "poultry product." At its broadest, the PPIA defines a "poultry product" as "any product which is made wholly or in part from any poultry carcass or part thereof." *Id.* § 453(f). Thus, UPSIDE's cell-cultivated-meat product qualifies as a "poultry product" only if UPSIDE has shown that its product is made from some part of a poultry carcass. UPSIDE has failed to do that for two reasons.

**1.** UPSIDE has not shown that its product contains any part of a poultry carcass.

47

To be "made from" part of a poultry carcass under the PPIA, the product must in fact contain part of the carcass. When the PPIA was passed, "made" in the food context was understood to mean "[a]rtificially produced . . . by concoction of ingredients." Made, *Webster's Second* at 1477. Seeing that the PPIA regulates poultry, common speakers would have known that any "concoction" regulated by the Act must include as an "ingredient[]" a part of the poultry carcass itself. After all, when one says, "I made chicken salad from the leftover chicken," they mean that the chicken salad in fact contains part of the leftover chicken. And that understanding tracks the statutory scheme, which targets products that "contain" or "consist of" poultry and other additives. *E.g.*, 21 U.S.C. § 453(f) (authorizing the USDA to exclude from the definition of "poultry product" items that "*contain* poultry ingredients only in a relatively small proportion"); *id.* § 453(g) (defining a poultry product as "adulterated" if it "bears," "contains," or "consists . . . of" certain substances); *id.* § 464(d) (exempting certain "pizzas *containing* a poultry product").

UPSIDE has not shown, however, that its cell-cultivated chicken contains any part of a chicken carcass. To make its product, UPSIDE

48

extracts "a single cell sample" from a chicken embryo.[23] It then manipulates that cell to split and regrow countless times in a cultivator through the process of cell mitosis.[24] Yet UPSIDE has offered no evidence showing that any part of the original cell remains after it is split millions of times through cell mitosis. In fact, the scientific literature that Appellees independently identified below suggests just the opposite. *See* DE65 at 24 (citing research stating that when a cell undergoes mitosis, a single cell "cop[ies] [its] chromosomes, and then divide[s] to form *new* cells," which are considered "daughter cells" that are distinct from the original "parent cell" and which, in this case, have never been part of a poultry carcass) (alterations in original).

UPSIDE countered below that "made from" need not mean "contains": On its telling, any item merely *derived* from a poultry carcass is a poultry product. *See* DE36-1 at 23-24. But that reading gives "made from" a sense that veers from its ordinary meaning. Under that view,

---

[23] *The UPshot: What Do Cells Eat?*, UPSIDE Foods Blog (July 20, 2024), https://tinyurl.com/singlecellsample.

[24] *See The Cell Cycle, Mitosis and Meiosis for Schools and Colleges*, University of Leicester, https://tinyurl.com/3e6rcrds (last visited Mar. 17, 2025); *supra* note 23.

UPSIDE would apparently characterize most stovetop meals as being "made from" PAM Cooking Spray and most instant rice as being "made from" water. What is more, if all that is necessary is that the substance figure into the food item's creation story in some way, every apple pie would be "made from" apple seeds and every box of popcorn "made from" cow manure. But that is not how ordinary people talk, which is what matters. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning.").

**2.** Even if the definition of "poultry product" requires only that a product be *derived* from a part of a poultry carcass, UPSIDE's product still does not qualify: It derives from a poultry cell, which is not a "part" of a poultry carcass in the relevant sense. If it were, this Court would equally be compelled to conclude that a food item drawn from a single chicken-cell mitochondrion—typically less than one micrometer in diameter[25]—would also be a poultry product under the PPIA. That sort of literalism "strangle[s] meaning," *Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946), and ignores that courts should strive "to discern literal

---

[25] B. Alberts et al., *The Mitochondrion*, Nat'l Libr. of Med., Nat'l Ctr. for Biotechnology Info., https://tinyurl.com/tinymitochondrion (last visited Mar. 17, 2025).

meaning *in context*." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 40 (2012).

In the context of the PPIA, "part" instead means an *appreciable piece* of a poultry carcass, like an organ, wing, or beak. *Cf. United States v. Yellow Cab Co.*, 332 U.S. 218, 225 (1947); *United States v. Paramount Pictures*, 334 U.S. 131, 173 (1948) (reading "*any part* of the trade or commerce among the several states" as any "appreciable part"). That understanding is borne out by other sections of the PPIA and the USDA's own regulations, all of which focus on *meaningful* "parts" of a chicken:

| Provision Number | Relevant Language |
|---|---|
| 21 U.S.C. § 466(a) | Barring importation of "slaughtered poultry, or *parts* or products thereof . . . unless they . . . contain no dye, chemical, preservative, or ingredient which renders them unhealthful, unwholesome, adulterated, or unfit for human food."<br><br>It would have been quite difficult for a cell to "contain" anything other than itself in 1968. *See* Mitsuru Furusawa et al., *Injection of foreign substances into single cells by cell fusion*, Nature (May 31, 1974), https://tinyurl.com/cellinjection ("A good technique for injecting a given substance into an individual cell would be of value in cell biology."). |
| 21 U.S.C. § 455(c)<br>21 U.S.C. § 453(g)(1), (2)(C) | Acknowledging that "poultry carcasses and *parts thereof*" can be "found to be adulterated," and defining "adulterated" as something that "bears or contains any poisonous or deleterious substance" or "bears or contains any food additive which is unsafe." |
| 9 C.F.R. § 381.66(b)(1)(i) | Noting that every "official poultry slaughter establishment must ensure that *all poultry carcasses, parts, and giblets* are chilled immediately after slaughter operations." |
| 9 C.F.R. § 381.80(b) | Regulating "[a]ll carcasses, organs, or *other parts* of carcasses of poultry[.]" |
| 9 C.F.R. § 381.79 | Declaring that "[e]ach carcass and *all organs and other parts of carcasses* which are found to be not adulterated shall be passed for human food." |

52

| 9 C.F.R. § 381.1(b) | Defining "ready-to-cook poultry" as "any cut-up or disjointed portion of poultry or *other parts of poultry, such as reproductive organs, head, or feet* that are suitable for cooking without need of further processing." |
| 9 C.F.R. § 381.1(b) | Defining "carcass" to mean "all parts, including viscera, of any slaughtered poultry." "Viscera" means the "internal organ[s] of the body," especially those "located in the great cavity of the trunk proper." Viscera, *Webster's Third New International Dictionary* 2556-57 (1966) |

By focusing on appreciable parts—like chicken organs, heads, and feet—the PPIA's statutory and regulatory frameworks reveal that ordinary speakers understand poultry-carcass "parts" to be something more than desultory collections of cells and cytoplasm. The Court should thus reject the "sterile literalism" that would define "part" to include anything greater than or equal to a quark, *N.Y. Tr. Co. v. Comm'r of Internal Revenue*, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.), and hold that UPSIDE has failed to show that its cell-derived product is covered by the PPIA.

**B.    Even if the PPIA did apply, the district court rightly held that SB 1084 does not offend the ingredients and facilities clauses.**

In all events, the PPIA preempts SB 1084 only if the latter establishes either an "ingredient requirement[]" or a "[r]equirement[] . . . with respect to premises, facilities and operations of any official establishment." 21 U.S.C. § 467e. But as the district court held, SB 1084 imposes neither an ingredient requirement nor a facilities requirement, so the PPIA's preemption provision does not apply.

### 1.    SB 1084 does not violate the ingredients clause.

The ingredients clause bars States from enacting "ingredient requirements" for poultry products that are "in addition to, or different than, those made under [the PPIA]." 21 U.S.C. § 467e. The PPIA does not define "ingredient requirement," so it "carries its ordinary meaning." *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 854 (11th Cir. 2009). In common usage, an "ingredient" is a physical component of a composite item. *See* Ingredient, *Webster's Second* at 1278 ("That which enters into a compound, or is a component part of any combination or mixture[.]"). And a "requirement" is "[a] requisite . . . condition." Requirement, *Webster's Second* at 2117. So an "ingredient requirement" is a requisite

54

condition for a physical component in a poultry product. *See Canards II*, 870 F.3d at 1147-48; Brief for the United States as Amicus Curiae, *Canards II*, No. 17-1285, 2018 WL 6389601, at *10-13.

As the district court held, SB 1084 does not fit that definition. An arguable statewide ban on an ingredient—like SB 1084's ban on cell-cultivated poultry—falls beyond the ordinary meaning of an "ingredient requirement." Nor does SB 1084 even target physical ingredients; it targets only one *process* for creating them, and a process is not an ingredient.

**i.** The ingredients clause reserves to the federal government the power to regulate ingredients in poultry products. *See* 21 U.S.C. § 467e. Yet that clause presumes that the regulated ingredients in fact exist within the State. *See Canards II*, 870 F.3d at 1150. And when a State bans an ingredient, the ingredient may not lawfully exist within the State and thus will never become part of the State's poultry market. As a result, Florida's ban on cell-cultivated meat does not impose a "requirement" for any poultry ingredient; it precludes cell-cultivated meat's existence in the State, ensuring that cell-cultivated meat will never become a poultry ingredient "in the first instance." *Nat'l Meat*, 565

U.S. at 467; *see also* DE40 at 16 (holding that even if something is a "poultry product," "this does not mean that a state is expressly preempted from banning the sale of" it).

*Canards II* is instructive. Foie gras producers there argued that banning the sale of meat derived from force-feeding birds violated the ingredients clause because it effectively banned the ingredient of foie gras. 870 F.3d at 1149. Even accepting that the law functionally banned foie gras, the Ninth Circuit rejected the claim. The ingredients clause, held the court, "governs only the physical composition of poultry products," and neither "mandate[s] that particular types of poultry be produced" nor "limits a state's ability to regulate the types of poultry that may be sold." *Id.* at 1150. "If foie gras is made, producers must, of course, comply with the PPIA." *Id.* "But if a state bans a poultry product like foie gras, there is nothing for the PPIA to regulate." *Id.* "The fact that Congress established 'ingredient requirements' for poultry products that *are* produced does not preclude a state from banning products . . . well before [they enter the production process]." *Id.* (emphasis in original).

That reasoning nullifies UPSIDE's claim. If Florida permitted cell-cultivated meat in poultry products, the ingredients clause would apply.

But because Florida has banned cell-cultivated meat "well before" it enters the poultry-production process, "there is [no ingredient] for the PPIA to regulate," and its ingredients clause is not implicated. *Id.*; *see Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta (Canards III)*, 33 F.4th 1107, 1115 (9th Cir. 2022) (reiterating that point); *Evolution Fast Food Gen. P'ship v. HVFG, LLC*, No. 15-cv-6624, 2017 WL 4516821, at *7-9 (S.D.N.Y. Sept. 27, 2017) (similar).[26]

The Fifth Circuit interpreted the FMIA's analogous preemption provision similarly in *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007).[27] That provision, like the

---

[26] UPSIDE argues that *Canards II* is inapt because California's law dictated how animals had to be treated while alive, whereas Florida's law prevents UPSIDE from doing something to a chicken embryo post-slaughter. *See* Init. Br. 59-63. But as the district court said, "this distinction is beside the point." DE40 at 21. What is more, the *Canards II* court's ruling that even a "total ban of foie gras . . . would still not run afoul of the PPIA's preemption clause," 870 F.3d at 1150, is a holding entitled to just as much deference as its alternative holding that an "animal husbandry practice[]" is not an ingredient, *id.* at 1149. *See Union Pac. R.R. Co. v. Mason City & Ft. Dodge R.R. Co.*, 199 U.S. 160, 166 (1905) (When an opinion includes alternative holdings, "neither is *obiter* [*dicta*], but each is the judgment of the court, and of equal validity with the other.").

[27] UPSIDE also claims that *Empacadora* is inapt because it "deal[s] with the treatment of animals while they are alive." Init. Br. 59. Like the district court noted, "this is simply incorrect." DE40 at 20. The law at

57

PPIA's, prohibits States from imposing additional "ingredient requirements" for meat products. 21 U.S.C. § 678. Rejecting a claim that Texas's horsemeat ban constituted an ingredient requirement in violation of that provision, the Fifth Circuit unhesitatingly concluded that the federal statute "in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place." *Empacadora*, 476 F.3d at 333. The court clarified that "even if the FMIA implicitly recognizes the legality of selling horsemeat for human consumption, that does not necessarily preclude a state from prohibiting it unless Congress additionally intended to preempt such legislation." *Id.* n.4. The FMIA's preemption provision evidenced no such intent. Neither does the PPIA's.

*National Meat* only confirms that analysis. Construing the FMIA's identical facilities clause, *infra* 55-56, the Supreme Court contrasted a ban on the sale of meat from disabled pigs with a ban on the sale of horsemeat. 565 U.S. at 467. The former ban came within the facilities

_____

issue there criminalized the "sale" of and "possess[ion] with the intent to sell . . . horsemeat as food for human consumption." *Empacadora*, 476 F.3d at 330. Obviously, one cannot sell or possess horse*meat* when it is still *horse*.

58

clause's scope because it did not necessarily preclude a disabled pig from entering an FMIA-covered slaughterhouse; a pig might "become disabled either in transit to or after arrival at a slaughterhouse," so California's law could indeed affect animals already within the FMIA's reach. *Id.*

By contrast, a ban on the sale of horsemeat *does* prevent the meat from entering a slaughterhouse. Unlike meat from a disabled pig—which might become disabled only after entering a slaughterhouse—meat cannot alchemize into "horsemeat" upon reaching the slaughterhouse gates. *See id.* Rather, "the quality of being a horse is immutable and known to all involved well before the animal is within the physical or regulatory reach of the FMIA." Brief for the United States as Amicus Curiae, *Nat'l Meat*, No. 10-224, 2011 WL 3821398, at *28. So when a State bans horsemeat, "no horses will" come within the FMIA's reach, "because no horses will be ordered for purchase [in that state] in the first instance." *Nat'l Meat*, 565 U.S. at 467.

SB 1084 follows that logic. The "quality of being [from cultured cells] is immutable and known to all involved well before the [meat] is within the physical or regulatory reach of the [PPIA]." Brief for the United States as Amicus Curiae, *Nat'l Meat*, No. 10-224, 2011 WL

3821398, at *28. By banning cell-cultivated meat, SB 1084 thus ensures that no cultivated poultry cells will become poultry ingredients in Florida "in the first instance." *Nat'l Meat*, 565 U.S. at 467. SB 1084 therefore does not impose any condition on a physical component in a poultry product.

UPSIDE's contrary construction would defy "common sense" and raise "major questions" about the PPIA's scope. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 159 (2000); *see Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). On its reading, the PPIA forbids Florida from banning scores of potentially dangerous food ingredients simply because they might be used in poultry products. That all-encompassing view would stop States from banning questionable substances like saccharin and coal tar dye—both of which are "approved" for use in poultry products, *see* 9 C.F.R. § 424.21(c)—despite their hazy health implications.[28] UPSIDE's reading would even bar a State of vegetarians from banning poultry, and preclude Florida from outlawing

---

[28] *E.g.*, Omar Hasan Azeez et al., *Long-Term Saccharin Consumption and Increased Risk of Obesity, Diabetes, Hepatic Dysfunction, and Renal Impairment in Rats*, Medicina (Kaunas) (Oct. 9, 2019), https://tinyurl.com/9cwbbzvs; *Color Additives in Foods*, FDA (July 6, 2023), https://tinyurl.com/mr3b9xvu.

the slaughter of its State Bird (the mockingbird), simply because those items might one day comprise a poultry dish.

The PPIA is not so draconian. It "targets the slaughtering, processing, and distribution of poultry products," but it neither demands "that particular types of poultry be produced for people to eat," *Canards II*, 870 F.3d at 1150, nor upends the State's "historic police powers" to ban food items for the public's welfare, *Reynolds*, 2015 WL 1879615, at *8. Because SB 1084 does nothing more, it does not offend the ingredients clause.

**ii.** As discussed, SB 1084 is not an ingredient requirement even if framed as a ban on an ingredient. But SB 1084 is better understood as a ban on one *process* for creating food. Nothing in the law precludes any physical component—like poultry meat—from existing in poultry products. It simply bars that component when it is produced by "cultur[ing] animal cells." Fla. Stat. §§ 500.03(1)(k), 500.452. That law does not restrict a physical element in a product; it merely restricts one "technique" for creating those elements—the technique of cell cultivation. *Canards II*, 870 F.3d at 1149; *see Evolution*, 2017 WL 4516821, at *7-9.

61

Ducking that problem, UPSIDE defines the physical component that SB 1084 regulates as "*cultivated* poultry cells." Init. Br. 43. But the definition of "ingredient" under the PPIA does not concern the process used to create a physical component; it concerns only the physical component born of that process. *See Canards II*, 870 F.3d at 1147-48.

*Canards II* proves the point. There California banned the sale of foie gras if it was made by "force feeding a bird." *Id.* at 1143. Foie gras producers argued that the statute effectively outlawed "force-fed" foie gras as a "physical component" in poultry products. *Id.* at 1149. Yet the Ninth Circuit rejected that process-oriented definition of "physical component." *Id.* "Force-fed," the court explained, "is not a physical component that we find in our poultry; it is a feeding technique that farmers use." *Id.* "The same logic applies to the difference between regular chicken and cage-free chicken. 'Cage-free' is no more an 'ingredient' than 'force-fed.'" *Id.* The court thus held that the relevant "physical component" was simply foie gras, not "force-fed" foie gras. *See id.* And since California's law regulated only the process of force feeding, it was not an ingredient requirement. *See id.*; *Evolution*, 2017 WL 4516821, at *7-9 (similar).

62

Just so here. Florida's law does not prohibit using poultry cells in poultry products. It merely forbids one process for growing those cells: the process of cell cultivation. Because that requirement does not implicate the physical components of a poultry product, SB 1084 does not offend the ingredients clause.

### 2. SB 1084 does not violate the facilities clause.

SB 1084 does not violate the facilities clause either. That clause bars Florida from enacting "[r]equirements within the scope of [the PPIA]" for "premises, facilities and operations of any official establishment" operated by UPSIDE. 21 U.S.C. § 467e. SB 1084 lies beyond that definition for two reasons.

First, UPSIDE does not have "any official establishment[s]" in Florida. As UPSIDE "concedes[,] it does not manufacture cultivated chicken in Florida." DE40 at 19. And since SB 1084 applies only to businesses in Florida, it cannot impose requirements for UPSIDE's "premises, facilities [or] operations." 21 U.S.C. § 467e. That should end the analysis of UPSIDE's facilities clause argument before it even begins.

But even if UPSIDE could overcome that hurdle, SB 1084 does not offend the facilities clause because it does not "reach[] into [any of

UPSIDE's] facilities and affect[] its daily activities." *Nat'l Meat*, 565 U.S. at 467. The law simply prevents UPSIDE from delivering the cultivated-meat products it makes at those facilities to Florida buyers *post-production*. SB 1084 thus "works at a remove from the sites and activities that the [PPIA] most directly governs" and falls outside of "the [facilities clause's] scope." *Id.*; *see Canards II*, 870 F.3d at 1152; Brief for the United States as Amicus Curiae, *Nat'l Meat*, No. 10-224, 2011 WL 3821398, at *28. As the district court put it, "Florida has not sought to reach into [UPSIDE's] facilities to tell them how they should handle their cultivated chicken cells throughout the production process." DE40 at 20. Florida's law therefore is not a facilities requirement under the PPIA. UPSIDE's assertion that Florida's law "prevent[s it] from manufacturing, distributing, and selling cultivated chicken," Init. Br. 58, is not only self-evidently false (UPSIDE can still manufacture its new-age meat item at its out-of-state facilities); it is not the concern of the PPIA's facilities clause, either.

## CONCLUSION

UPSIDE seeks to prevent Florida's elected representatives from banning an experimental food product with unknown health

64

consequences. The district court correctly rejected that claim, and UPSIDE has mooted its appeal in any event. The Court should either dismiss the appeal or affirm.

Dated: March 17, 2025                Respectfully submitted,

JAMES UTHMEIER
    *Attorney General*

*/s/ David M. Costello*
JEFFREY PAUL DESOUSA
    *Acting Solicitor General*
DAVID M. COSTELLO
    *Chief Deputy Solicitor General*
BRIDGET K. O'HICKEY
    *Deputy Solicitor General*
FOSTER H. SWARTZ
    *Solicitor General Fellow*
WILLIAM H. STAFFORD III
    *Special Counsel*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
david.costello@myfloridalegal.com

*Counsel for the State Attorneys*

66

## CERTIFICATE OF COMPLIANCE

1. This document complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 10,615 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27, Federal Rule of Appellate Procedure 32(a)(5), and Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

*/s/ David M. Costello*
Chief Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on March 17, 2025, I electronically filed this answer brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ David M. Costello*
Chief Deputy Solicitor General